James R. Jones, Charles C. Jones, William G. Gorman, Robert Lott, John Tippin, Matthew T. Tippin, and John R. Tally, Plaintiffs in Error, *v.* Catherine McMasters, by her next friend, Manuel Ybarba.

Where a person was born at Goliad, then in the State of Coahuila and Texas, being a part of the Republic of Mexico, which place was also the domicil of her father and mother until their deaths, and was removed at the age of four years, before the declaration of Texan independence, to Matamoras, in Mexico, this person is an alien, and can sue in the courts of the United States.

20h    8
L-ed  805
47f  134
47f  554

*Jones et al. v. McMasters.*

Her allegiance remained unchanged, unless by her election, which it was incumbent on the opposite party to show.

According to general principles, mere alienage did not forfeit a title to land in Texas; and although the Constitution of Texas provided that no alien should hold land in Texas, except by title emanating directly from the Government of that Republic, yet it was afterwards declared that the Legislature should, by law, provide a method for determining what lands may have been forfeited or escheated.

In the absence of such a legislative provision, a title emanating from the Government of Mexico, anterior to Texan independence, is not forfeited.

In a court of law, where a grant from the Government is in regular form, it is not proper to inquire into the voidability of the grant from equitable considerations.

THIS case was brought up, by writ of error, from the District Court of the United States for the district of Texas.

The case is stated in the opinion of the court.

It was argued by *Mr. Hale* for the plaintiffs in error, and by *Mr. Hughes* for the defendant.

The principal question in the case was, whether Catherine McMasters was a citizen of Mexico or of Texas. The arguments of the counsel upon this point were as follows:

*Mr. Hale's* first point was this:

The District Court should not have sustained the demurrer to the plea to the jurisdiction pleaded by John R. Tally. It appeared by the allegations of that plea that the plaintiff was, at the time of the institution of the suit, a citizen of the State of Texas. The Constitution of the Republic of Texas declared that "all persons (Africans, the descendants of Africans, and Indians, excepted) who were residing in Texas on the day of the declaration of independence, shall be considered citizens of the Republic, and entitled to all the privileges of such." (Const. Rep. Gen. Prov., sec. 10; Hart. Dig., p. 38.) And the incorporation of the Republic of Texas into the Union, "on an equal footing with the original States in every respect," necessarily converted the citizens of the Republic of Texas into citizens of the State of Texas and of the United States. (Joint Resolution for annexing Texas to the United States, March 1, 1845, 5 Stat. at L., 797; act of Dec. 29, 1845, 6 Stat. at L., 1.) It follows, that any person who, within the meaning of the Constitution of the Republic, *resided* in Texas at the time of the declaration of independence, and continued thus to be a citizen of the Republic until the period of annexation to the United States, became thereby a citizen of the State of Texas, and was not competent to bring a suit, in the District Court of the United States, against other citizens of the same State. The only point which presents any difficulty is in relation to

the meaning of the phrase, "who were residing in Texas," used in the Constitution of the Republic. There can be little doubt, however, that the framers of the Constitution intended this phrase to be equivalent to the corresponding one, "who had their domicil in Texas," and did not design to deprive of their citizenship those who were physically absent from the country. Many of the most respectable and deserving residents of Texas were not, personally, within the limits of the Republic at the date of the declaration of independence. They had been forced to leave the country, temporarily, by the advance of the Mexican army; they had accompanied their suffering families to the refuge offered by the United States, on the eastern bank of the Sabine; they had been sent on missions by the General Council, to arouse the sympathies of the Western States; they had returned to their former homes, to bring their wives and children, left there during hostilities, to the country now redeemed by their arms. The history and legal annals of Texas are filled with examples. (Yoakum's History of Texas, vol. II, pp. 34, 36, 118, 125, 175, 181; Ordinances of Gen. Council, pp. 52, 55, 56, 58; Republic *v.* Young, Dallam, 464; The State *v.* Skidmore, 5 Tex., 469; Russell *v.* Randolph, 11 Tex., 464–'6.) It could not be intended by the Constitution of the new State, then in need of citizens, and anxious to attract them, to disfranchise such persons by a rigorous and literal application of the term "resident." And this conclusion is confirmed by the established meaning of this term. (Lambe *v.* Smith, 15 Mees. and W., 434; Hylton *v.* Brown, 1 Wash. C. C. R., 314; Blanchard *v.* Stearns, 5 Met., 303; Crawford *v.* Wilson, 4 Barb., 522.) It is true that in some instances, especially in cases arising under attachment laws, it has been said that residence and domicil were not always equivalent terms, and that a citizen domiciliated in one State, might have a temporary residence in another. But these decisions were based entirely upon the consideration of the object and intention of the particular statutes which were then to be interpreted, and do not deny that in other statutes, having a more enlarged purpose, the two terms would be regarded as identical. Strictly speaking, the mere fact of inhabitancy does not constitute a domicil; the intention of remaining must also exist; but it follows, from this very rule, that a domicil implies and presupposes a residence, and that one who had his domicil in the Republic of Texas, necessarily resided there—legally, if not physically. The position here assumed is strengthened by the fact, that at the time of the declaration of independence of Texas, the western portion of the new Republic was filled with the military forces and polit-

ical adherents of the invader. It would be the height of absurdity to suppose that the framers of the Constitution designed to convert the troops and the supporters of Santa Anna, then actually within Texas, and with a literal residence in the country, into citizens of the revolutionary Government.

If, then, the Constitution of the Republic of Texas conferred citizenship upon those who had their domicil in the country at the time of the declaration of independence, it will follow that Catherine McMasters was a citizen of the Republic. It appeared by the allegations of the plea that the domicil of her birth or origin was in Texas, at the town of Goliad, and that domicil certainly continues until another is acquired. (Somerville *v.* Somerville, 5 Vesey, 787; Monro *v.* Monro, 7 Cl. and Fin., 876; Mascard de Prob. concl. 85, No. 1.) To acquire another domicil, an intention to abandon the domicil of origin must exist. (Monro *v.* Monro, 7 Cl. and Fin., 891.) And an absence of fifteen or twenty years is not in itself, without proof of such intention, sufficient to forfeit the original domicil. (Merlin, Repert. Domicile, § 2; Dalloz, Dict. Gen. Domicile, § 1, Nos. 9—13.) In the case of Saint Germain, absent in India for forty-five years, it was decided that such absence, without proof of his intention to abandon his residence in France, did not divest him of his domicil. (Dalloz, Jur. Gen., vol. 6, pp. 383–'4.) The intention or *animus,* thus essential to the acquisition of a new domicil, must be a legal and disposing will, and the voluntary act of a mind capable in law of acting. It can only be evinced by a person *sui juris.* (Somerville *v.* Somerville, 5 Ves., 787; Guier *v.* O'Daniel & Young, note to 1 Binn., 349, 352.) And, *a fortiori,* an infant or child cannot be capable of such an intention. *Nam infans, et qui infanti proximus est, non multum a furioso distat.* (Inst. III, 19, 10.) A minor, without parents or legal tutor, can therefore never lose or abandon *proprio marte* the domicil of origin. (Story Confl. Laws, § 46, 506, note; 1 Burge Comm. Col. Law, 38, 39; Pothier, Cout. d'Orleans, Ch. 1, sec. 1, Nos. 12—18; ed. de Brugnet, vol. 1, p. 5; Desduitz de St. Pierre *v.* Revel, Sirey, 35, p. 2, 556.) And this principle has been repeatedly recognised in the decisions of the Supreme Court of Louisiana—a court the most conversant with such questions. (Robbins *v.* Weeks, 5 Mart. N. S., 379; Succession of M. J. Robert, 2 Rob. La. R., 435–'6.) It is true that the surviving father or mother, that is to say, the natural tutor, may change, at will, the domicil of the minor, and transfer it to a different country; (Potinger *v.* Wightman, 3 Mer., 67, 79;) but this power does not extend to a mere friend, or to a person assuming, without the direct authority of law, the custody of the minor's person. (Robbins *v.* Weeks, 5 Mart.

N. S., 379.) These rules are well explained by J. Voet, in his Commentaries on the Pandects, (Lib. V, tit. I, No. 100,) where he says, "*Ut enim haud difficiliter admittendum sit minorennem non magis posse domicilium mutare quam contrahendo se obligare; tamen quemadmodum contrahere auctore tutore permissum ei est, itaque et domicilium cum patre matreve, tanquam tutelæ ejus aut saltem educationi præposita, tutoribus cæteris non contradicentibus, mutare nihil vetat.*" It is because the authority of the tutor supplies the defect of legal capacity or volition in the minor, that the latter acquires the domicil to which he accompanies the guardian; but as the authority of the delegated or appointed tutor ceases when he removes beyond the limits of the country, (Johnstone *v.* Beattie, 10 Cl. and Fin., 42, 87, 113, 148,) only the natural guardian—the parent of the minor, whose power remains unimpaired—can change the domicil of his ward to a new country. (School Directors *v.* James, 2 Watts and S., 568, 572.) These principles are substantially recognised in the case of Hardy *v.* De Leon. (5 Tex., 234–'8.) Sylvester De Leon resided in Texas at the date of the declaration of independence; in 1838, he was removed by the military authorities of the country to Louisiana, where his son, Francisco Santiago De Leon, was born; the wife of Sylvester died; the family then removed to Tamaulipas, and the children were left in the care of their grandmother, while Sylvester returned to Texas; after a short visit, he again went to Tamaulipas, with the intention of returning to Texas with his children, but was killed on the road. Francisco, his youngest son, however, came to Texas, and lived at Goliad; and in a suit commenced in his name, it was pleaded by the defendants that he was an alien enemy. The Supreme Court of Texas held that the plaintiff's father, Sylvester De Leon, had never lost his citizenship in Texas; and if he had, or if his citizenship did not attach to his infant son, born in Louisiana, still the domicil of origin, acquired by the birth of Francisco in Louisiana, could not be forfeited by his removal, during minority, and without his own volition, to Mexico.

The case made by the present plea in abatement is stronger than that of Hardy *v.* De Leon. Catherine McMasters was a child, less than five years of age, at the time of her removal from the domicil of her parents and of her own birth, in Texas, to a foreign country. Her parents were both dead; she has had no recognised tutor, nor has she been emancipated by marriage; she was removed by the family of Manuel Sabriego, with which she has continued to reside; and it does not appear that the family, which she thus accompanied, had any legal authority whatever to control her course in life, or

decide on her domicil. It was incumbent on the plaintiff to have repelled the legal presumption arising from these facts, by a replication to the plea, and the demurrer should have been overruled.

These views are confirmed by a recent decision of the Supreme Court of Texas, made at Tyler, in 1857, in the case of Wheeler *v.* Hollis. (See manuscript opinion.) In the course of this decision, after referring to the doubt as to the general authority of a guardian to change the domicil of his ward, the court states its conclusion to be, that a mother is not deprived, by her second marriage, of the natural right of controlling the person of her child, and determining its future home; but that this power does not extend to the mere legal guardian, after the death of both parents, nor authorize the mother, even as natural guardian, to change the domicil of the child, to the injury of its interests or the forfeiture of its property. "*When an infant has no parents, the law, it is true, remits him to his domicil of origin or to the last domicil of his parents.* But when he has a surviving mother, it is difficult to perceive the justice or propriety there would be in not permitting her to make her domicil that of her children." " In other communities, it may not be unusual for children, who have parents, to have others appointed their guardians; and then it may be truly said that the ward is not naturally or necessarily a part of the guardian's family;" "*and so it may be said where the ward has no parent.*" And the court cites the opinion of Ch. J. Gibson in School Directors *v.* James, 2 W. and S., 568, with approbation, and affirms the rule, that "whatever may be the power of the guardian over the person and property of the ward, he cannot exercise it so as to injure the ward himself. The very end and purpose of his office is protection; and there is no imaginable case in which the law makes it an instrument of injury by implication." It is evident, from this decision, that Sabriego had no power to remove the infant plaintiff from the domicil of origin for any reason, much less to make such removal when it would work a forfeiture of the minor's lands in Texas.

This part of the case, however, can be put upon higher ground. The principles of the Spanish law, and not the law of nations or of nature, controlled the political rights of persons under both the Republics of Mexico and of Texas. The jurisprudence of Spain in relation to questions of citizenship was strictly and perhaps too exclusively national in its spirit. It admitted of no divided allegiance; it suffered no expatriation from the native soil. The domicil of the origin fixed the political rights and duties of the subject and citizen forever. "By law, no one can denaturalize himself." (Part.

II, 18, 29; Part IV, 24–'5.) And Aguila y Roxas, in his excel
lent notes to his grandfather's treatise on the conflict of laws
in relation to entailments, sums up the whole doctrine in this
paragraph: " *Originarius hujus Regni, qui in aliud se transtulit,
non amittit originem, quia quemadmodum patrem mutare non possu-
mus, ita nec patriam: pro qua videndi qui hanc sententiam sequun-
tur, Bart.* in L. Assumptio in princ. ff. ad Muncipal; *Sozin.* in
cap. licet ratione ult. num. 52, de for. compet; *Sanchez* de
Matrim lib. 3, disp. 23, num. 4; *Barbos.* in L. Hæres absens
§ Proinde n. 24 and 5, 26, 41, 87, 102, and 130, cum seq. de
Judic.; *Menoch.* cons. 1076 a num. 3, and cons. 600, num. 7,
and cons. 80, num. 10, and seq. and cons. 112, n. 61; *Pasc.*
de vir. pat. potest. 3. cap. 2, n. 31; *Peregrin.* cons. 55; *Man-
uel Barbos.* ad Ordin. Portugal, lib. 2, tit. 56, in princ. num.
2; *Ciarlin.* Controv. for. cap. 149, *ubi elegans · ratio ibi:* quia
statim atque natus est patria, illi hypothecatus est; *Vid. D.
Amaya* in L. 7 c. in col. num. 32 and seq.; *Carleval.* de Ju-
dic. tit. 1, disp. 2, num. 124; *Surd.* cons. 560, num. 5; *Cald.
Pereyra* in Resp. pro D. Joan. de Tassis n. 9." (See Aguila
y Roxas, Additæ Quæst, P. III, ch. 1, no. 8; Notes of Greg.
Lopez to Part. IV, 24–'5.) The political existence of Cathe-
rine McMasters was attached to the soil, and, in the language
of Ciarlina above cited, she was *mortgaged* to it as her coun-
try. She might lose her rights of property by absence, or her
civil privileges by disuse; but the Republic of Texas could
not suffer her to sacrifice the political duties which wedded
her to the country of her birth—much less allow a self-ap-
pointed guardian to sever this infant, without power or free-
dom of choice, from her natural mother.

Mr. *Hughes:*
I. This plea shows that plaintiff below did not reside in
Texas at the day of the declaration of independence, but was
then residing in Matamoras, or elsewhere in Mexico. And
we would say that this settles the question, for a *prima facie*
case, to say the least, is made, showing that she was not a
citizen of the Republic.

The declaration of the Constitution of the Republic is, "All
persons (Africans excepted, &c.) who were residing in Texas
on the day of the declaration of independence, shall be con-
sidered citizens of the Republic, and entitled to all the privileges
of such."—Const. of Rep., Gen. Prov.; sec. 10, Hart. Dig., p. 38.

But, to avoid the effect of this provision, it is contended that
the word "residing," in the connection it is found, should be
construed the same as "domicil;" and to show that there might
be a domicil, without a continued actual residence, numerous

authorities will no doubt be referred to—all of which, as before stated, will be admitted to be good law; but they do not meet the case. For it is manifest that the Convention which framed the Constitution did not intend to indicate "domicil" by the language used; and the error, if error there be, in the premises or conclusions of counsel, is in supposing that only by virtue of the provision of the Constitution cited, was it declared who were citizens of Texas and who were not. We suppose the provision inserted was so inserted for the purpose of providing for a class of persons who, upon general principles, might not be citizens of the new Republic. There were and could not have been otherwise than great numbers of persons, within the limits of Texas, who had not become citizens, and all such it was intended to make citizens. This will appear from an examination of the other provisions of the same 10th section and other sections of the Constitution. But, again, had the word "domicil" been used instead of "residing," there would have been something in the argument. Domicil does not necessarily indicate residence, for the authorities show, that though domicil may be accompanied with residence, it is not always so; but there may be domicil without actual residence. Residence does not always indicate domicil.

If it had been the intention to make a declaration which was to determine as to all persons who should be citizens of the Republic, some other term would have been used; but the use of the expression inserted shows that there might be other persons who were citizens, besides those provided for—those, for instance, who had been, and up to the day of the declaration of independence continued to be, citizens of the State of Coahuila and Texas, residing in Texas, but who might be temporarily absent from the State, on business of the country, &c.

Transient persons, however, were not provided for, as they should not have been. The Mexican army in the west spoken of, who came to subjugate Texas, being all transient, could not come within the language "residing."

This question will now be viewed in its true character, not as a mere question of domestic domicil, but in that more important, as a question of national character.

The plea shows that Catherine McMasters was, from the time of her birth up to about the age of four years, domiciled in Goliad, the place of her birth, but removed therefrom by those under whose charge she was, to Matamoras, before the declaration of independence. She then was a native Mexican, owing allegiance to the Republic of Mexico. When she was removed, a revolution had commenced, and was subsequently

perfected by the declaration of independence. It will not be questioned, it is presumed, that after the close of the revolution, those who had participated in the struggle on either side, by reason of their adherence to Texas or to Mexico, were either Mexicans or Texans, as they adhered to the one side or the other. But how was it with others, who by no act of adherence had made an election? It has been contended for plaintiff in error, that this was settled by the domicil of each individual: if within Texas, then they were Texans; if in Mexico, then they were Mexicans. And in this particular, Catherine McMasters, being a minor, and incapable of will, though removed beyond the limits of Texas before independence was declared, did not forfeit the domicil of her birth, that of her parents, and was a Texan. When reasoning as to domicil, this may all be well enough; but, as before intimated, we are speaking of national character, under particular circumstances; and this, in the circumstances in which Catherine McMasters stood, depended on election. If she had remained in Texas, she would have been regarded as a Texan citizen. But having been removed to Mexico, she thereby adhered to Mexico, though she had no will on the subject; but being a minor, not having power to make an election, she had time until majority to make such election; and when made, she would be a citizen of that State to which she adhered; but in the mean time she could be considered in no other light than a citizen of Mexico. These principles have been recognised in this court, and applied to a case occurring during our revolution.

A native-born American, resident in New York, united himself to the English forces in possession of New York, and adhered throughout the struggle to the British side, and went off with the British forces, and died in the British dominions. His son, born in New York, was taken with him, and continued under his charge. This son afterwards claimed an estate by descent, and it was determined that he was an alien, and could not take by descent; and in delivering the judgment of the court, Mr. Justice Thompson says: "John Inglis, if born before the declaration of independence, must have been very young at that time, and incapable of making an election for himself; but he must, after such a lapse of time, be taken to have adopted and ratified the choice made for him by his father, and still to retain the character of a British subject, and never to have become an American citizen, if his father was to be so considered. He was taken from this country by his father before the treaty of peace, and has continued ever since to reside within the British dominions, without signify-

ing any dissent to the election made for him; and this ratifi- cation as to all his rights must relate back, and have the same effect and operation as if the election had been made by him at that time."

Again: "The British doctrine therefore is, that the American *ante nati*, by remaining in America after the treaty of peace, lost their character of British subjects. And our doctrine is, that by withdrawing from the country and adhering to the British Government, they lost, or perhaps, more properly speaking, *never acquired*, the character of American citizens."—Inglis *v.* The Sailors' Snug Harbor, 3 Peters, 122–'3.

And this is the case which shows the distinction between mere questions of domestic domicil and the more important questions as to national character. In the former, the question of domicil of a minor is settled by that of his father, or the last of the father, when he is dead; while in the latter, the national character depends upon election, whether the party be adult or minor, though the act of the father making his election may operate an election for the son, if his dissent be not made in due time.

But did Catherine McMasters either show a dissent or an election to become a Mexican, instead of a Texan? It will be seen, by an examination of the plea in question, that she was about four years of age when she was removed by Manuel Sabriego to Matamoras, before the declaration of independence, in March, 1836; she was therefore of age eighteen years afterwards, in the year 1853. We have no evidence of a dissent to the act of removal by Sabriego, or of an election to become a citizen of Texas; and upon the principles established in the case referred to in this court, it must be presumed that she ratified the act of her friend, and remained a citizen of Mexico, and was so by relation from the time of removal and the declaration. But the plea is contradictory in regard to the age of Catherine McMasters, for after the statement of her age before the declaration of independence, it is in another part alleged that she was a minor at the time of filing said plea in 1854. This matter of the age is material; and if the contradiction is to have effect at all, one averment destroys the other, and then there is no good plea, for the want of material averments.

Mr. Justice NELSON delivered the opinion of the court.

This is a writ of error to the District Court of the United States, possessing Circuit Court powers, held in and for the district of Texas.

This suit was brought in the court below by Catherine McMasters, to recover the possession of a tract of land lying in the

county of Goliad, in the forks of the San Antonio river and the Cabaza creek, containing four leagues of land. Four of the defendants put in a plea of not guilty. At a subsequent day, John R. Tally was allowed to come in and defend as landlord of Lott, one of the defendants. Whereupon, he put in a plea to the jurisdiction of the court, upon the ground the plaintiff was a citizen of the State of Texas. The plea states that she was born at Goliad, then in the State of Coahuila and Texas, when it was a part of the Republic of Mexico; that the domicil of her father and mother were at this place at the time of her birth, and continued there till their deaths. That the plaintiff was removed from the Territory of Texas to Matamoras, west of the Rio Grande, in Mexico, when she was about four years of age, during the revolutionary movements in Texas, and before the declaration of independence, which was on the 2d March, 1836. That she was removed in the family of M. Sabriego, in which she had lived in Texas, and with whom she has continued to reside since in Mexico. There was a demurrer to this plea, which was allowed, and the defendant required to answer over. The defendant then put in a plea of not guilty, and also a special plea in bar of alienage, and limitation of nine years before suit brought, founded upon a statute of the State of Texas.

There was a demurrer to this plea, but undisposed of for aught that appears on the record, when the parties went down to the trial of the issues of fact.

On the trial, the plaintiff proved a title in due form, under date of the 16th July, 1833, to the land in controversy, in her grandmother, Maria de Jesus Ybarba Trejo, followed by the official survey and judicial possession; also, that her grandmother died in possession of the premises, leaving the plaintiff's mother, her only child, at the death of her mother and father. Her grandmother and mother died about the year 1834. Her father was killed in the same year.

The defendants claimed under patents from the State of Texas, one dated 15th September, 1849, for three hundred and twenty acres; the other, the 20th of February, 1847, for like number; which covered the possessions on the tract in dispute of two of the defendants.

When the evidence closed, the counsel for the defendants prayed the court to charge the jury, that if the plaintiff, as a Mexican citizen, had continued to reside out of Texas from a period before the declaration of Texan independence, the action could not be sustained; which was refused, and a charge given, that her right remained as it was before the revolution, both according to general principles and by force of the treaty of

Guadalupe Hidalgo; and that if she had a right of property, that gave her the right to sue here.

The counsel also prayed the court to charge, that if the jury should believe, from the evidence, that the survey and grant under which the plaintiff claims title extends so as to include a large area out of the limits prescribed by law, as dated in the decree No. 190, of the laws of Coahuila and Texas, and that the error did not arise from mistake of quantity, but from intention to depart from the legal mode of survey, then the jury might consider the grant void as to such area as might be out of the limits prescribed by law, and also that the grant itself would be void in such cases for want of legal survey. Which prayer was refused.

The counsel also requested the court to charge, that if the jury should believe, from the evidence, that the survey and grant under which the plaintiff claimed extended so as to include a large area as aforesaid, and that the grant and survey were so made by fraudulent procurement on the part of the grantee, by an agent in that behalf, then the jury might consider the grant as entirely void.

The court so instructed the jury; but with the addition, that unless the alcalde commissioner was informed, at the time he gave possession and issued the title, of the fact that the survey had been extended so as to include a large area, &c., the grant would not be void; that the fraudulent procurement of the survey alone would not vitiate the grant.

The counsel also requested the court to charge, that the grant under which the plaintiff claimed is one of the class that might be forfeited for non-performance of conditions. That ordinarily a law of the Legislature, and judicial action under it, would be necessary to avoid such a grant. Yet that claimant might act so as to supersede the necessity of such a judicial determination; and if conduct of plaintiff amounted to an admission of the forfeiture, she could not afterwards set up the right, especially against a person who had, in the mean time, acquired a grant from the State; and that it was a question for the jury to determine, whether the conduct of the plaintiff amounted to an admission of forfeiture.

The court gave the instruction, with the addition, that it was a question as to the actual intention of the plaintiff; and the jury should be satisfied, considering the infancy and all other circumstances, that such was in fact her intention, or they should find for the plaintiff.

The jury found a verdict for the plaintiff.

As the practice in the court below permits pleas of whatever nature or description to be put in as a defence to the suit at

the same time, and without regard to the order of pleas, as known to the system of the common law, it will be necessary in the first place to examine the question raised on the demurrer to the plea to the jurisdiction. It is insisted that the plaintiff is a citizen of the State of Texas, according to the facts as stated in the plea and admitted by the demurrer; and if so, as she is not a citizen and resident of a different State, but a resident of Texas, the suit cannot be maintained within the 11th section of the judiciary act. We think the objection not well founded.

The plaintiff was born under the dominion of the Mexican Republic, and has lived under it ever since her birth, and beyond all question, therefore, is a citizen of that Government, owing it allegiance, which has never been interrupted or changed. There has been no act of hers, or of any one competent to represent her, or to determine her election, indicating an intention to throw off this allegiance, and to attach herself to the new sovereignty of Texas. Having been born and having always lived under the old Government, the burden rested upon the defendants, who claimed that she was a citizen of the new one, to establish the fact of the change of her allegiance. (2 Cranch, 280; 4 ib., 209; 1 Dallas, 53; 20 Johns. R., 313; 3 Peters R., 99, 122, 123; 2 Kent C., 40, 41.) The facts set up in the plea prove the contrary. According to these, the plaintiff was nineteen years old when this suit was commenced, and between twenty-two and twenty-three years when the plea was put in to the jurisdiction. If she was competent to make an election while a minor, but after she had arrived at mature years, as to the Government to which she would owe allegiance, the presumption, upon the facts, is, that she has made it in favor of the one under which she has lived since her birth. If she was incompetent to make it during her minority, then the allegiance due at her birth continued, and existed at the time of the commencement of the suit.

We do not enter upon the question of the domicil of a minor discussed on the argument, nor express any opinion upon it, as the question here is one of national character, and does not stand upon the mere doctrines of municipal law, but upon the more general principles of the law of nations. (3 Peters, 242; 2 J. Cas., 29.)

Assuming that the plaintiff is an alien, and not a citizen of Texas, the next question is, whether or not she is under any disability that would prevent her from the assertion of her title to the premises in question; in other words, whether her absence and alienage worked a forfeiture of the estate. The general principle is undisputed, that the division of an empire works no forfeiture of a right of property previously acquired. Kelly *v.* Ham-

son. (2 J. Cases, 29; 7 Pet., 87.) And, consequently, the plaintiff's right still exists in full effect, unless the new sovereignty created, within which the lands are situate, have taken some step to abrogate it. The title remains after the revolution, and erection of the new Government, the same as before. The 10th section of the Constitution of the Republic of Texas, adopted the 17th March, 1836, provided that *"no alien shall hold land in Texas, except by title emanating directly from the Government of this Republic."*

By the 20th section of the 7th article of the present Constitution of the State, it is provided "that the rights of property and of action which have been acquired under the Constitution and laws of the Republic of Texas shall not be divested; nor shall any rights or actions which have been divested, barred, or declared null and void, by the Constitution and laws of the Republic of Texas, be reinvested or reinstated by this Constitution; but the same shall remain precisely in the situation which they were before the adoption of this Constitution." And by the 4th section of the 13th article, it is provided "that all fines, penalties, forfeitures, and escheats, which have accrued to the Republic of Texas under the Constitution and laws, shall accrue to the State of Texas; and the Legislature shall, by law, provide a method for determining what lands may have been forfeited or escheated."

It is understood that the Legislature of Texas has not yet passed any law providing for the steps to be taken to give effect to escheats for alienage, or otherwise; at least, no such law has been referred to, or relied on, in the argument; and the course of decision in the courts of Texas appears to be, that, until some act of the Legislature is passed on the subject, effect cannot be given to the plea of alienage, or, at least, that some proceeding must be had, on the part of the Government, divesting the estate for this cause, before effect can be given to it. 15 Texas R., 495.

The defence of alienage, therefore, was properly overruled by the court below.

The counsel for the defendants insist that the estate of the plaintiff became forfeited under the Mexican laws, by her removal from the State of Coahuila and Texas to Matamoras, while under the Mexican Government, and a permanent residence taken up there.

But the removal that worked a forfeiture under Mexican colonization laws, and divestiture of the title without judicial inquiry, was a removal out of the Republic of Mexico, and settlement in a foreign country. The principle has no application in this case. 18 How., 235, (McKenny *v.* Sarvego.)

The remaining questions in the case relate to those arising upon the survey and location of the premises in question. This survey and location were made by the Government surveyor, under the direction of the alcalde and land commissioner of the municipality, who was deputed by the Governor to cause the land to be surveyed, and to convey the title in due form. The counsel for the defendants claimed the right to inquire into the regularity of this survey and location, and also into the *bona fides* of the transaction.

It must be remembered that this is a suit at law to recover the possession of the land in dispute; and that, although it may be the course of practice in the courts of the State of Texas, in a suit of this description, to blend in the proceeding the principles of law and equity, in the Federal courts sitting in the State, the two systems must be kept distinct and separate. This principle is fundamental in these courts, and cannot be departed from. The court, therefore, in a suit at law, should exclude the hearing and determination of all questions that belong appropriately and exclusively to the jurisdiction of a court of equity. In a case calling for the interposition of this court, and turning upon equitable considerations, relief should be sought by bill in equity. Many of the cases at law coming up from the District Court of this State are greatly complicated and embarrassed, from the want of the observance of this distinction in the proceedings before it. In respect to the survey and location in the case before us, we perceive no ground that could warrant the court in going behind them in a suit at law. They were made by the Government that granted the title, and there is no ground, or even pretence, for saying that they were made without authority; and hence, altogether void. If voidable, for irregularity or other cause, the question was not one for a court of law in an action to recover possession, but for a court of equity to reform any error or mistake. (9 Peters, 632; 13 ib., 368–'9; 3 Wh., 212, 221; 7 How., 844.) We think a satisfactory answer might be given to the several objections taken to the survey and location; but we prefer to place it upon the ground above stated.

The judgment of the court below affirmed.