# TOMASA MARTINEZ DE HERNANDEZ ET AL.

*v.*

# JUAN BERTRAN CASAÑAS ET AL.

San Juan, Law, No. 402.

1. The declaration of intention to preserve Spanish citizenship provided for by the treaty of peace between Spain and the United States might, for a minor, be made by her father or her guardian.

2. The foregoing is true although said minors, children of fathers born in the Peninsula, were themselves born in Porto Rico, and were residing here when the treaty took effect.

3. G. O. No. 132, series of 1899, by the military governor of Porto Rico, cited and approved.

4. A woman of Spanish citizenship, resident of Porto Rico, who marries a citizen of Porto Rico, follows his citizenship, and becomes a citizen of the latter country.

Order filed April 9, 1907.

*Francis H. Dexter, Esq.,* attorney for plaintiffs.

*Henry F. Hord, Esq.,* attorney for defendants.

RODEY, Judge, delivered the following opinion:

This case comes before the court at the present time on the

NOTE.—Effect of marriage on wife's status as an alien, see note to Comitis v. Parkerson, 22 L.R.A. 148.

Martinez de Hernandez v. Casañas.

issue raised by a plea to the jurisdiction for want of proper diverse citizenship. Oral arguments were had and briefs have been filed. The suit is an important one, being brought to recover a half million of dollars alleged as damages. As can be imagined, it has been presented with great care by the respective counsel.

A brief statement of the facts out of which the demand is alleged to grow, while not necessary, may not be out of place. It appears that prior to the year 1884, a mercantile firm known as Noya & Hernandez was, and had been, doing a large business at the city of Humacao, Porto Rico. It was composed of Serafin Noya and Tomas Hernandez, the latter being the husband of plaintiff, and said Noya being the husband of defendant Encarnación Frias de Noya. Both of these partners died in or about that year, and it is said an inventory of the firm's property then made, showed that it reached a value of $640,000. The estate was immediately put into course of settlement with the widows of the partners as liquidators with power to jointly and severally settle up the same, and that said widows are still such liquidators. It is alleged also that in the year 1884 the defendants Juan Bertran y Casañas and José Rodriguez de las Albas and Domingo Rodriguez de las Albas then existed as, or then formed, a partnership known as Rodriguez Brothers & Bertran. That they took immediate possession, by whose leave it does not appear, of the assets of this Noya & Hernandez estate.

That between that date and the year 1891, in one way or another, they converted it all to their own use. That they accomplished this through all sorts of chicanery, fraud, duress, and conspiracies; that part of the time this was done in conjunction with the defendant Encarnación Frias de Noya, one of said liquidators; and also that it was done through the making of

false and fraudulent deeds, mortgages, etc.; and also by collecting the estate's debts, and the creation and simulation of indebtedness against it, and by undue influence, and, as it is alleged, at times even by force and violence. That by these means they induced and compelled the said Encarnación Frias de Noya, who had full power to act alone and separately, to execute such instruments and powers in their favor, and, at times acting even without the same, as that they in time possessed themselves by such series of frauds of the said entire estate without ever paying anything therefor.

That all of the personal property thus fraudulently obtained has been converted, appropriated, or lost by the said firm of Rodriguez Brothers & Bertran, and by the partners thereof, and that the real estate thus fraudulently secured by them has all been sold and conveyed to third persons, who claim the same as innocent purchasers for value without notice, and that hence this plaintiff, because it appears the entire estate, real and personal, has gone beyond specific recovery, is forced to bring a plain action at law for the recovery of damages for such wrongdoing. It appears also that two of these partners, to wit, José Rodriguez and Domingo Rodriguez, have died since the year 1891, and that their heirs took their estate in such manner, under the local law, as makes them responsible for the debts and torts of their said ancestors, and that the claim herein has been kept alive by this plaintiff through the intervening years by proper annual demands, judicial and extrajudicial.

It seems to be another of the numerous and apparently stale claims of large dimensions inherited by this court from Spanish times. It may or may not, of course, be accompanied by such surrounding facts on the merits, as entitle plaintiff to relief, but as to this we cannot at this time, not having any informa-

tion, express an opinion. We have no knowledge of what an answer, if filed, might allege in the way of denial, defense, or counter allegation, or whether a defense on the merits exists.

Under the ruling of this court made some time since in the Vallecillo y Mandry v. Bertran case, ante, p. 46, if it shall appear that there are Porto Ricans on each side of the controversy, then we are without jurisdiction to entertain the case. It was agreed at the hearing, and that is the rule under the pleas, that at this time this is the only question to be considered. On the admitted facts, the citizenship of the parties becomes a disputed question of law for the determination of the court. Therefore a statement of the admissions and disputed law as to such citizenship is proper.

It is admitted that the plaintiff Tomasa Martinez de Hernandez, the widow of the senior partner of the original firm, is a Porto Rican.

It is also admitted that the other widow and liquidator, Encarnación Frias de Noya, although made a party defendant, because, as alleged, she refused to join the plaintiff in this action, is in reality a plaintiff for purposes of jurisdiction, and can be classed as such by the court. She is also admitted to be a Porto Rican, not having preserved her Spanish allegiance during the year of option after the treaty of Paris.

The defendant Juan Bertran y Casañas is admitted to be a Spanish subject, a native of the Peninsula, who duly preserved his national status; and it is also admitted that the brothers, the late José Rodriguez and Domingo Rodriguez de las Albas, his partners in said firm of Rodriguez Brothers & Bertran, were also Spanish subjects, natives of the Peninsula.

Miguel Bustelo, the husband of María Rodriguez y Pujals de Bustelo, is a Porto Rican, but he being only a nominal party

Martinez de Hernandez v. Casañas.

defendant, can have no effectual weight in giving or ousting jurisdiction.

The defendant Juana Pujals, formerly widow of Domingo Rodriguez, one of the said partners of the mercantile firm of Rodriguez Brothers & Bertran, is conceded to be a Spanish subject, as she followed the nationality of her second husband and is now living in Spain; and the defendants Vicente and Julia Rodriguez y Pujals, her two minor children, are also Spanish subjects, as they have been residing with their said mother and domiciled in Spain since before the date of the ratification of the treaty of Paris, with intent to remain there, and were so residing there at the time of the filing of this suit.

Therefore the principal, and practically the only, contention in the cause at the present time is over the citizenship of María Rodriguez y Pujals de Bustelo and Manuela Rodriguez y Pujals, daughters respectively of José Rodriguez de las Albas and Domingo Rodriguez de las Albas, who were the partners in said firm of Rodriguez Brothers & Bertran.

During the year immediately after the ratification of the treaty of Paris, being the time within which the same might, under the terms of the treaty, be done, the said José Rodriguez, a native of the Peninsula, when making for himself and wife a declaration in that behalf, also made a declaration for his then minor daughter, the said María, and his then minor niece, the said Manuela, under the treaty, to preserve their Spanish allegiance. His power to do this for these minors is denied by counsel for defendants.

Some months since, this court held in suit No. 309, ante, p. 517, where she was plaintiff, for reasons given in a short opinion filed therein, that said María was a Spaniard at the time of the filing of that suit, and that, under the law, when this court has juris-

diction at the time of the filing of a suit, no change in the situation of the parties could thereafter affect the same. It appears that since the date of the filing of that suit, the said María has married Mr. Bustelo, a Porto Rican, and hence it is claimed by counsel for defendants, and strenuously resisted by counsel for plaintiffs, that she has now become, and is, a Porto Rican by reason of her citizenship becoming merged in and following that of her husband. She was born here on the island seventeen or eighteen years before the treaty and has even since continued to reside here.

Said Manuela is the daughter of Domingo Rodriguez and the said Juana Pujals. She is now of age and unmarried, and was also born, and has always lived, here on the island.

As stated in the brief of counsel for defendants: "If either one of these two ladies (that is, María Rodriguez y Pujals de Bustelo and Manuela Rodriguez y Pujals) are held to be citizens of Porto Rico, this case, under the ruling aforesaid in the Vallecillo y Mandry v. Bertran Case, ante, p. 46, must be dismissed on the pleas now before the court."

Their citizenship, of course, depends primarily on the wording of article 9 of the treaty of Paris, and § 7 of the organic act of Porto Rico, the latter commonly known as the Foraker law (31 Stat. at L. 77, chap. 191), and also upon the general policy of the United States, as exhibited in its legislation, and as the same can be gathered from the decisions of our courts, and on admitted propositions of international law as laid down by the text writers.

The material portion of article 9 of the treaty reads: "Spanish subjects, natives of the Peninsula, residing in the territory over which Spain by the present treaty relinquishes or cedes her sovereignty, may remain in such territory or may remove there-

Martinez de Hernandez v. Casañas.

from, retaining, in either event, all their rights of property, etc. . . . In case they remain in the territory they may preserve their allegiance to the Crown of Spain by making, before a court of record, within a year from the date of the exchange of ratifications of this treaty, a declaration of their decision to preserve such allegiance; in default of which declaration they shall be held to have renounced it and to have adopted the nationality of the territory in which they may reside.

"The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress." [30 Stat. at L. 1759.]

Section 7 of the organic act referred to is as follows: "That all inhabitants continuing to reside therein who were Spanish subjects on the eleventh day of April, eighteen hundred and ninety-nine, and then resided in Porto Rico, and their children born subsequent thereto, shall be deemed and held to be citizens of Porto Rico, and as such entitled to the protection of the United States, except such as shall have elected to preserve their allegiance to the Crown of Spain on or before the eleventh day of April, nineteen hundred, in accordance with the provisions of the treaty of peace between the United States and Spain entered into on the eleventh day of April, eighteen hundred and ninety-nine; and they, together with such citizens of the United States as may reside in Porto Rico, shall constitute a body politic under the name of The People of Porto Rico, with governmental powers as hereinafter conferred, and with power to sue and be sued as such."

In the painstaking and elaborate brief which counsel for defendants has filed, after stating many well-known and practically undisputed jurisdictional propositions, he lays down on the sub-

Martinez de Hernandez v. Casañas.

ject of the citizenship of these women, three propositions which
may be shortened and stated as follows:

1. That the declaration made by José Rodriguez for his
daughter, the said María, and his niece, the said Manuela, was
of no legal effect under the treaty or the law, because they were
both, although then being minors, "native inhabitants" of Porto
Rico.

2. That the citizenship of both of said women (although as
aforesaid then being minors), they being "native inhabitants" of
Porto Rico on April 11, 1899, must be considered without ref-
erence to the citizenship or acts of their respective parents, and
they are therefore citizens of Porto Rico, the decisive fact in
such case being the place of nativity, and;

3. That even if both of said women shall be considered to have
been Spanish subjects since the treaty, nevertheless, one of them,
the said María Rodriguez y Pujals, having since that time, and
before the filing of this suit, merged her nationality in that of
her husband, Miguel Bustelo, on her marriage to him, she is now,
and was at the time of the filing of this suit, a citizen of Porto
Rico.

Both the court and the bar of the island have had considerable
trouble endeavoring to understand the exact meaning of article
9 of the treaty and § 7 of the organic act as quoted above. On
the one hand, it is contended that the opening words in said
article 9, "Spanish subjects, natives of the Peninsula, residing
in" (Porto Rico), must be strictly construed; that is, limited to
the person making the declaration provided for, to retain his
Spanish allegiance, and that he cannot include in such declara-
tion any other person, not even his wife or minor children, if
they happen to be native Porto Ricans.

So far as we are informed or have been able to ascertain after

Martinez de Hernandez v. Casañas.

some examination of the subject, this treaty is the first one to which the United States is a party, that narrowed this right to preserve allegiance to the country to which they formerly belonged, to a particular class of inhabitants of the country ceded.

When the treaty of Guadalupe-Hidalgo was entered into, in February, 1848, between the United States and Mexico, all citizens of the latter remaining in the ceded country were permitted to retain their former allegiance by declaring such intention within a year in a manner duly provided for in the treaty. In considering why this privilege was restricted in the present instance, we are led to believe that it was simply considered inexpedient to insert the clause in the old form, because of the great number of people living in Porto Rico, Cuba, and the Philippines,—probably as many as seven or eight millions,—and this nation had probably not at that time, and perhaps has not even yet, fully determined its policy with reference to the acquired territory and its people. Hence we can readily understand the closing phrase of article 9 of the treaty, that: "The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress."

Looking back over history, we realize that there were relatively but a few thousands of people in Florida when we acquired it, and the same may be said of the vast area known as the Louisiana purchase. Even when we acquired from Mexico the vast domain now comprising the states of California, Nevada, Utah, and a part of Colorado, and the territory of Arizona and a part of New Mexico, it had within its borders, most of whom lived along the Pacific coast and in the Rio Grande valley, in New Mexico, and a few in southern Arizona, not to exceed probably sixty or seventy thousand people all told. All this territory was

Martinez de Hernandez v. Casañas.

contiguous to the United States proper, and the nation was not at that time as jealous of the incorporation of new people and the territory where they live, into the Union as states, as it has since become; therefore it did not require a very large force to govern them in the interim, so it seems not to have been thought against the policy of the nation to permit any person desiring to continue to reside therein, to retain his allegiance to his former government.

We can well see how, under the circumstances, grave results might have followed the insertion of such a broad provision in the treaty of Paris. In Porto Rico, for instance, where nearly a million of people lived at the time, if that had been done, and any large proportion of the people retained their Spanish citizenship, grave results might have followed, and heavy expense have been entailed upon the government of the United States, as, of course, none but citizens, or those who would accept allegiance to our government, could be appointed to any office. For this reason, counsel for that side of the proposition here are contending for a strict construction of the language of the treaty in that regard. On the other hand, it is contended that all of the circumstances must be taken into consideration, and that no construction should be given to the language referred to that would have results repugnant to common sense and civilization, and that for this reason it cannot be said that the high contracting parties intended that this privilege granted to certain Spanish subjects should result in splitting up families and creating incongruous conditions that would be both embarrassing and unnatural.

That it was intended that every such Spanish subject should not only have the privilege of retaining his own allegiance to the Spanish Crown, but also that of his wife and then minor

Martinez de Hernandez v. Casañas.

children. That even this construction would result in but a relatively few people retaining Spanish allegiance,—perhaps not to exceed ten thousand in all in Porto Rico,—and that, in the course of a few years, a large proportion of these would return to Spain. We understand that this statement is proving historically true and that not to exceed six or seven thousand people, including wives and minors, thus preserved their allegiance to Spain, and that a large percentage of them have already returned to that country.

Therefore, notwithstanding the strenuous contention to the contrary, and the elaborate argument made in that behalf by counsel for defendants, we are constrained to take this latter view of the subject, and we think therefore that general order No. 132 and its amendments, issued by the military commander of the United States during the military occupancy of Porto Rico in that year of option, providing for the manner in which this allegiance could be preserved by husbands, widows, next friends, guardians, tutors, masters, etc., was a sensible and proper construction of the provisions of the treaty in that regard. This is practically what we held some months since, although the facts were slightly different, in cause No. 196 on the docket, entitled, Rios de Rubio v. Burset, ante, p. 189, and we see no reason to change the views therein expressed. See also Shanks v. Dupont, 3 Pet. 242, 7 L. ed 666, and Jones v. McMasters, 20 How. 8, 15 L. ed. 805.

Whatever may have been the law previous to 1855, when the first act of Congress (U. S. Rev. Stat. § 1994, U. S. Comp. Stat. 1901, p. 1268) on the subject was passed, we think it is now well settled as to the United States that the citizenship of a married woman merges in that of her husband, and that this is a policy that ought to be followed in all territories or other places subject

II. PORTO RICO.—34.

Martinez de Hernandez v. Casañas.

to our national jurisdiction. See also subhead 6, § 4 of the new naturalization law, June 29', 1906, chap. 3592, p. 598, Sess. Laws 59th Congress.

A perusal of Van Dyne on Citizenship, and an examination of the third volume of Moore's International Law Digest, under the proper headings, where full citation of, and comment upon, the treaties, statutes, diplomatic correspondence, and decisions of the courts of the United States and other civilized countries with reference to citizenship is had, will, we think, satisfy anyone that this position is sound.

We are also well aware that it has come to be a policy of this nation, sustained by the statutes and decisions of the courts, that nativity or birth in the United States and subject to the jurisdiction thereof, with an exception or two in cases of the children of diplomats and other foreign government officials, fixes citizenship of the United States inherently in and upon such person. This is made manifest by a decision of the Supreme Court of the United States delivered by Mr. Justice Gray in 1898 in the celebrated case of the American Chinese boy Wong Kim Ark, 169 U. S. 649, 42 L. ed. 890, 18 Sup. Ct. Rep. 456. This opinion is, of course, binding upon all courts in the nation, and, although the Chief Justice and Mr. Justice Harlan dissented, is, in and of itself, one of the most valuable historical reviews and legal contributions on the subject of American citizenship through the incident of birth, and in fact on the subject of citizenship generally, that exists to-day. To save quoting at length from the above-mentioned sources of information and law, we ask all interested to read the same, and they will, we think, find ample support for the views we here express.

Great stress is laid upon this fact of the accident of birth, by counsel for defendants here, with reference to children born on

Martinez de Hernandez v. Casañas.

the island, but with all due respect, we cannot see how it is parallel or applicable. See Shanks v. Dupont, and Jones v. McMasters, supra. Previous to the treaty there was no distinction in Spanish subjects between those that were natives of the Peninsula and those that were natives of Porto Rico. These women were not born in the United States or subject to the jurisdiction thereof in the sense of the first clause of the 14th Amendment to the national Constitution. They were born subjects of Spain. This exception in the treaty was something not to be included in it; it was inserted to save a citizenship which those mentioned already possessed, and it ought to be presumed, as it is in all other cases between contracting parties, that the contract or treaty was made with reference to existing law, and the customs of civilized nations, and especially is this so, we think, when the unit and sacredness of the family are involved.

We are well aware, and we concede that it is a general doctrine, recognized by most civilized nations, that when children have, during their minority, because of their residence, a citizenship forced upon them, different from that which they might be entitled to because of the place of their birth, they may be vested with the right, after coming of age, to elect to which country they desire to adhere, especially if they are then residing in the country and under the sovereignty of their birth. See Van Dyne, Citizenship, supra, pp. 25, 116, and 119.

We have heretofore doubted whether, since the expiration of the year of option under the treaty, and the passage of the organic act, in the absence of further legislation by Congress, there was any mode by which a person could become a citizen of Porto Rico save by birth, or by being a citizen of the United States and residing in the island; but from the examination we have made in this case under the direction of the brief of coun-

Martinez de Hernandez v. Casañas.

sel for defendants, we feel constrained to hold, for the reasons herein expressed, that a foreign woman may acquire that status by marrying a Porto Rican. Therefore we hold that these two women had their allegiance to the Spanish Crown properly preserved for them, and that after the year of option provided for in the treaty of Paris, they remained Spanish subjects, and that thereafter the said María, by her marriage to Mr. Bustelo, became a Porto Rican, and was such at the time of the filing of this suit. The said Manuela, having done nothing since becoming of age to change her Spanish citizenship, that was thus preserved for her by her uncle, retains it still.

This holding as to the citizenship of the said María Rodriguez y Pujals de Bustelo renders the case subject to our ruling in the Vallecillo y Mandry v. Bertran Case, ante, p. 46, and constrains us to hold that the plea herein as to her must be sustained, and unless the complaint can be, and is, properly amended within ten days so as to give jurisdiction to this court, it will stand dismissed with costs, and it is so ordered.

Note.—Supplemental statement by the COURT (not to be published as a part of the opinion, but merely as a note thereto).

Not that it is necessary to a decision of this case, save to the extent implied in the foregoing opinion, but because of the importance of the subject, and in the hope that the *dicta* may, to some extent, lessen the large amount of controversy between counsel, we here append what we think would be a reasonable interpretation of the portion of the treaty of Paris referred to:

That on April 11, 1899, under the 9th article of the treaty of Paris, all actual or constructive native-born Porto Ricans, continuing actually or constructively to thereafter reside in Porto Rico, except those of them who were then either the

Martinez de Hernandez v. Casañas.

wives, widows, or minor children of any Spanish subject, a native actual or constructive of the Peninsula, absolutely lost their previous status or condition of being Spanish subjects, and immediately thereafter assumed the condition of being citizens of Porto Rico, owing permanent allegiance to the United States. But that all then Spanish subjects, natives actual or constructive of the Peninsula, continuing thereafter actually to reside in Porto Rico, could, under that article, within one year from said date, preserve for themselves, their wives and then minor children, their Spanish allegiance in the manner set out in the treaty; and this same right, we think, existed in favor of any widow of such native of the Peninsula, and in favor of the minor children or orphans of such parents, and could be exercised in their behalf in any proper or reasonable manner, and would be effective even as to those born in Porto Rico, unless repudiated within the proper time by the person interested on coming of age.

We mean by "actual or constructive native-born Porto Ricans" to include Spanish subjects born in the adjacent ceded islands; and by "actually or constructively to thereafter reside in Porto Rico" to also include residence in said islands, and those Porto Ricans who were temporarily absent before, at, and after said date. The term "actual or constructive natives of the Peninsula" is meant to include natives of the Balearic and other islands that can, with reason, be included within that term.