JOHN F. McKINNEY, PLAINTIFF IN ERROR, *v.* MANUEL SAVIEGO, AND PILAR, HIS WIFE.

Where a person, who owned land in Texas whilst it was a part of Mexico, removed into Mexico prior to the declaration of independence by Texas, and continued to reside in Mexico until her death, her daughter, who was also a citizen of Mexico, could not, as heir, recover the land in Texas.

By the laws which governed Texas before the revolution, the proprietor of land must have resided within the jurisdiction of the Mexican government, and foreigners could not inherit land.

The constitution of Texas considered as aliens all those who did not reside there at the time of the declaration of independence, unless they were afterwards naturalized; and also decreed that no alien should hold land in Texas, except by titles emanating directly from the government of that republic.

The legislature of Texas had power to modify these rules, but did not change them in this respect when it introduced the common law by statute. Upon the death of the ancestor the estate was cast upon the State, without the necessity of an inquest of office.

The constitution and laws of Texas provide for the case of an alien heir who may inherit from a citizen, but not for an alien heir inheriting from an alien.

The treaty of Guadaloupe Hidalgo provides for those Mexicans who inhabited territories ceded to the United States, but had no relation to Texas.

THIS case was brought up, by writ of error, from the district court of the United States for the district of Texas.

The case is stated in the opinion of the court.

It was submitted on printed arguments by *Mr. Hale,* for the plaintiff in error, and by *Mr. Hughes,* for the defendants.

The arguments involved many points of the old Mexican law, but the principal one was thus stated by *Mr. Hale,* in his additional brief:—

The plaintiffs, in their petition, describe themselves as aliens; and in the thirteenth instruction which they requested, they assume that both the female plaintiff and her mother were aliens to the republic of Texas, and that the former is still an alien to the United States. It is evident, therefore, that at the time of the death of Gertrudis Barrera, the female plaintiff was, with respect to the land in Texas, the alien child of an alien, and the first question is, could she take the estate by inheritance?

The tenth article of the general provisions of the constitution of the republic of Texas, Hart. Dig. p. 38, provides that " no alien shall hold land in Texas, except by titles emanating directly

from the government of this republic.   But if any citizen of this republic should die intestate or otherwise, his children or heirs shall inherit his estate, and aliens shall have a reasonable time to take possession and dispose of the same in a manner hereafter to be pointed out by law," &c.   It is clear that the latter part of this provision, which gives to aliens a reasonable time to take possession and dispose of "the same," relates to the estate of a citizen of the republic, and not to that of an alien; and that the power given to the congress of the republic to point out the manner in which this disposition should be made, authorizes only laws relating to the estates of citizens.   The 14th section of the act of January 28, 1840, cited in the original brief, should, therefore, be restricted to this case; and of this opinion were the supreme court of Texas, in the case of Cryer *v*. Andrews, 11 Texas, 181, where this clause of the constitution and this act are said to be "in relation to the alien heirs of a deceased citizen."   The capacity of the alien children of an alien is thus left to be determined by the general prohibition of the constitution and by the principles of the common law, introduced into Texas, as a body, by the act of January 20, 1840, before the death of the plaintiff's ancestor.   Hart. Dig. art. 127.   And upon these, there can be no question that the female plaintiff, Pilar, being an alien, did not take the land in Texas, by descent, from her mother; and that the district court erred in giving the thirteenth instruction requested by her counsel.

*Mr. Hughes* contended that Gertrudis Barrera did not lose her land by removing to Tamaulipas before the declaration of independence, because the 8th section of that instrument was prospective.   "All persons who shall leave the country," &c.   Hart. Dig. 37.

Even if the land were liable to forfeiture, the 13th article, § 4, declared that "the legislature shall, by law, provide a method for determining what lands may have been forfeited or escheated." Until this was done, the title remained as it was.

The articles 585, 600, (Hart. Dig.) allowed an alien to take by descent.   The 38th article allowed the alien heirs of citizens a reasonable time to dispose of their property; but this included alien heirs of an alien, because the section provides that it shall be no bar to a descent that one of the ancestors of the claimant was an alien.

Mr. Justice CAMPBELL delivered the opinion of the court.
 The defendants (Saviego and wife) claimed, in the district court, two and one half leagues of land lying in the counties of Goliad and Refugio, in Texas, as an inheritance of Madame

McKinney *v.* Saviego et ux.

Saviego, from her mother, Gertrudis Barrera, who died in Mata-moros, in Mexico, in 1842.

Gertrudis Barrera acquired, in 1834, one league of the *locus* *in quo* by donation, and the remainder by purchase under the colonization laws of the State of Coahuila and Texas, while it formed a part of the republic of Mexico. She occupied and im-proved the land until the commencement of the revolutionary movements in Texas, in 1835, but prior to the declaration of independence in that year she emigrated and became a resident of Matamoros, where she continued until her death. The plain-tiffs were also citizens of Coahuila and Texas, but abandoned their connection with Texas in company with their ancestress, and have retained their *status* as Mexican citizens.

They are described on the record as aliens and citizens; and residents of the city of Matamoros, in the State of Tamaulipas, in the republic of Mexico. The defendant claimed the land by virtue of locations and surveys of valid land certificates, which had been regularly returned to the general land-office, in Texas, before the 31st August, 1853.

A number of questions are presented in the bill of exceptions, but the opinion the court has formed upon the 12th, 13th, and 14th instructions, given at the instance of the plaintiffs, in the district court, renders it unnecessary for us to consider any others. These instructions are as follows:—

" 12. If Gertrudis Barrera was a citizen of the republic of Mexico, domiciliated within the State of Coahuila and Texas when the land in question was granted to her, her abandonment of the State of Coahuila and Texas, and settlement in Mata-moros, in the State of Tamaulipas, after the commencement of the revolution in Texas, and before the declaration of Texan independence, was not a forfeiture of the land so granted, nor did the land thereby become vacant; and after the close of the revolution in Texas, she would have been authorized to enforce her right, had she then been living.

" 13. If Madame Barrera died in Tamaulipas, in 1842, then being a citizen of the said State of Tamaulipas, domiciliated there, and the female plaintiff was her only heir, she too being a citizen of, and domiciliated in Tamaulipas, said heir could and did take, by the law here, the land in contest, by descent, and had a right to enforce her title by descent, to the same extent that her ancestor could have done, but subject, as she is an alien, to forfeiture by proceedings on the part of the State.

" 14. But if no proceedings were instituted and perfected be-fore the late treaty between the United States and Mexico, the right in said heir becomes perfect, and not subject to forfeiture, by virtue of the 8th article of said treaty."

It is settled, in the jurisprudence of Texas, that the colonization laws of Coahuila and Texas annex, as an enduring and peremptory condition, to all titles issued by their authority, that the grantee, so long as he remains the proprietor, shall continue his domicile within the republic of Mexico, of which that State formed a part. A change of domicile operated to defeat the estate of the grantee, and to restore the land without encumbrance to the public domain, so that, without a judicial or other inquiry, it might be regranted. The same jurisprudence recognizes the prohibition upon foreigners to inherit lands in Mexico, for the owners of lands were subject to charges and obligations which citizens could alone perform. Halleman *v.* Peebles, 1 Texas, 673; Horton *v.* Brown, 2 ibid. 78; Yates *v.* James, 10 ibid. 168.

The conduct of Gertrudis Barrera and her children, the defendants in this suit, after the commencement of the revolutionary movements in Texas, and which separated that State from Mexico, deprived them of all claim to political rights in the new republic, and placed them under the civil disabilities of foreigners under its laws. The constitution of Texas, of 1836, identified as citizens only such persons as were residing in Texas on the day of the declaration of independence, or should be naturalized according to its provisions. Hart. Dig. 35, 38; Inglis *v.* Trustees of the Sailors' Snug Harbor, 3 Pet. 99. The same instrument provided that "no alien shall hold land in Texas, except by titles emanating directly from the government of this republic," (Hart. Dig. 38, § 10,) and provided that congress should, as early as practicable, introduce by statute the common law of England, with such modifications as the circumstances of the State might require. This duty was performed in 1840, by an enactment that "the common law of England, so far as it is not inconsistent with the constitution or acts of congress now in force, shall, together with such acts, be the rule of decision in this republic, and shall continue in full force until altered or repealed by congress." The common-law authorities clearly establish that Madame Saviego, under the circumstances, is not deemed to be an heir at law, having no inheritable blood, and, in the absence of such heirs, the estate would be cast immediately upon the State, without inquest of office. Orr *v.* Hodgson, 4 Wheat. 453; Hardy *v.* De Leon, 5 Texas, 211, 242.

We shall now examine if there are other provisions in the laws of Texas to relieve the defendants from the apparent disability.

The constitution of Texas, by way of exception to the general inhibition upon aliens to "hold lands except by titles emanating directly from the republic," declares, that "if any citizen should

die intestate or otherwise, his children or heirs shall inherit his estate, and aliens shall have a reasonable time to take possession of and dispose of the same in a manner hereafter to be pointed out by law." The 10th section of the law of distribution and descent, (Hart. Dig. art. 585,) provides : " In making title to land by descent, it shall be no bar to a party that any ancestor, through whom he derives his descent from the intestate, is or hath been an alien ; and every alien to whom any land may be devised or may descend, shall have nine years to become a citizen of the republic and take possession of such land; or shall have nine years to sell the same, before it shall be declared forfeited, or before it shall escheat to the government." The first clause of this section is substantially a reënactment of the statute of 11 and 12 William III. c. 6, and removes no other defect than the want of inheritable blood arising from the alienage of some person through whom the heir must deduce his claim. McCreery v. Somerville, 9 Wheat. 354.

The second clause modifies the existing laws which regulate the capacities of aliens to take or hold real property in the State, whether by devise or descent.

But the remedial effect of the act does not extend beyond the disability of an alien heir. It contains no enactment in favor of an alien who may have acquired possession or property in lands, whereby he could make a valid bequest or transmit it to his heirs, whether aliens or citizens by descent.

The act of which this section forms a part is framed for the disposal of the estates of those having "title to any estate in inheritance, and regulates its descent or distribution." The prohibition in the constitution upon aliens to hold lands in Texas, and the limited powers of congress to introduce favorable conditions in favor of alien heirs, must be remembered in ascertaining its meaning. The constitution had provided for the transmission of the estates of citizens to their children or heirs, (being citizens,) and then provides that congress shall legislate to give to aliens a reasonable time to take possession and to dispose of such an inheritance. Neither the language of the act nor the policy of the State, as it may be discovered from its constitutions and laws, authorizes the conclusion that an alien, claiming real property in Texas, can transmit it, by descent, to an heir who is also an alien.

The subject-matter to which these provisions all relate is the estates of citizens; and we cannot apply their conditions to the special and peculiar case of an inheritance claimed by an alien heir in the right of an alien intestate. The question has not arisen, so far as we can discover, in the courts of Texas ; but in the case of Cryer v. Andrews, 11 Texas, 170, the court seems to assume that the act we have considered was a legislative com-

pliance with the constitutional guarantees in favor of the alien heirs of deceased citizens; and that the alien heir must, within nine years, sell the lands or become a citizen. In the present instance, citizenship has not been acquired, which that court seems to treat as a prerequisite to an entry on the inheritance.

The last question remaining for consideration arises on the 8th section of the treaty with the republic of Mexico of the 2d February, 1848, (9 Stats. at Large, 923,) called the treaty of Guadaloupe Hidalgo. The first clause of that article provides "for the Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States." The second clause provides for those who shall prefer to remain in the said territories, and they are authorized to retain the title of Mexican citizens or acquire the rights of citizens of the United States. The third clause prescribes, "that in the said territories property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guarantees equally ample as if the same belonged to citizens of the United States." To what territories did the high contracting parties refer to in this article? We think it clear that they did not refer to any portion of the acknowledged limits of Texas. The territories alluded to are those which had, previously to the treaty, belonged to Mexico, and which, after the treaty, should remain within the limits of the United States. The republic of Texas had been many years before acknowledged by the United States as existing separately and independently of Mexico; and as a separate and independent State it had been admitted to the Union. The government of the United States, by that act, had conferred upon the population established there all the privileges within their constitutional competency to grant.

The various stipulations contained in this article are wholly inapplicable to the persons who, before the revolution in Texas, had been citizens of Mexico, and who, by that revolution, had been separated from it.

The right of property, to which this article of the treaty was designed to afford a guarantee, extended to property of every kind which, at its date, belonged to Mexican citizens, ("now belonging to Mexicans,") not established within the territories then ceded to the United States. In the present instance, the republic of Texas had acquired title many years before, and the land at the date formed a part of its public domain.

Our conclusion is, that the judgment of the district court should be reversed, and the cause remanded to that court for further proceedings.