## AIRHART *v.* MASSIEU.

1. A Mexican was not, by the revolution which resulted in the independence of Texas, or by her Constitution of March 17, 1836, or her laws subsequently enacted, divested of his title to lands in that State, but he retained the right to alienate and transmit them to his heirs, and the latter are entitled to sue for and recover them.
2. The division of a country and the maintenance of independent governments over its different parts do not of themselves divest the rights which the citizens of either have to property situate within the territory of the other.
3. That Constitution, although declaring generally that aliens shall not hold land in Texas except by title emanating directly from the government, did not divest their title; for it adds, that "they shall have a reasonable time to take possession of and dispose of the same in a manner hereafter to be pointed out by law." Before the title can be divested, proceedings for enforcing its forfeiture must be provided by law, and carried into effect; and hitherto they have not been provided.
4. In Texas, the protocol of a Mexican title is an archive which may be deposited in the General Land-Office at any time, subject to all just implications arising from delay and the circumstances of its history; and when so deposited, a certified copy thereof from the land-office is competent *prima facie* evidence of the title.
5. Until a title is deposited in the land-office, or duly recorded in the proper county, *bona fide* purchasers not having notice thereof, though claiming under a junior Mexican grant, will be protected.

ERROR to the Circuit Court of the United States for the Western District of Texas.

The facts are stated in the opinion of the court.

*Mr. John H. Reagan* for the plaintiff in error.

*Mr. John D. McPherson, contra.*

MR. JUSTICE BRADLEY delivered the opinion of the court.

This is an action of trespass to try title to land, being equivalent, in Texas, to an action of ejectment. The defendants in error were the plaintiffs below, and judgment being given in their favor, the case is brought here by writ of error. The petition in the action was filed on the 3d of June, 1872, and sets out that the plaintiffs are citizens of the Republic of Mexico, residing in the city of Mexico, and that on the 1st of July, 1869, they were seised in fee and possessed of a certain tract of land (containing eleven leagues), situated in the counties of Anderson and Freestone, on the right and left banks of Trinity River, stating the metes and bounds thereof; and that on that day the defendant, Airhart (now plaintiff in error), illegally ousted them, and continues to hold possession of the tract, to their damage.

The defendant demurred, and pleaded, 1st, not guilty; 2d, the Statute of Limitations for three years, in virtue of possession under regular title from the sovereignty of the soil, as to a certain portion of the land, containing 1,855 acres, giving the metes and bounds thereof, being the south part of E. C. Harris's survey; and the same plea as to another portion of the tract sued for (containing about 153 acres), giving the metes and bounds of the same; and disclaiming as to all the rest of the land sued for. The defendant further pleaded, 3d, the Statute of Limitations of five years, and payment of taxes as to the two tracts last named; 4th, the Statute of Limitations of ten years; and, 5th, adverse possession under an entry of title since 1850, and the erection of permanent improvements, for which he claimed compensation. Various amendments of the pleadings were subsequently added, which it is unnecessary to notice.

It appears from the various bills of exception taken in the case that the plaintiffs claimed title, 1st, under an eleven

league grant, made by the government of Coahuila and Texas to one José Ygnacio Aguilera, of the city of Mexico, on the 22d of March, 1830, and possessory title executed thereon by Commissioner Vicente Aldrete on the 26th of November, 1833; 2d, an act of sale of the said eleven leagues, passed on the twelfth day of March, 1836, in the city of Mexico, from the said Aguilera to Anna Matilda Massieu, a citizen of Mexico, then an infant, and who died in August, 1851, under age; and, 3d, descent to the plaintiffs as the heirs-at-law of said Anna Matilda, they being her mother and brothers and sisters, and all citizens of Mexico.

The defendant claimed title to the tract of 1,855 acres, mentioned in his pleas, under a grant from the State of Coahuila and Texas to Edward C. Harris, made Jan. 26, 1835, and through various mesne conveyances from said Harris to himself. He claimed title to the 153-acre tract (the other tract mentioned in his pleas), under a head-right grant made by the State of Texas to one Robert S. Patton, on the 4th of February, 1857, and through various mesne conveyances to himself.

The first question raised for the consideration of this court is that arising upon the alienage of the plaintiffs. This question was raised by the demurrer to the petition, so far as relates to their right to maintain an action for land. The subsequent proceedings raised the further question, whether, being aliens, they could inherit lands in Texas in 1851 from Anna Matilda Massieu, who was also an alien; and, if they could, whether they could continue to hold the title thereof without residing in Texas and becoming citizens. These questions may be conveniently considered together.

Texas, which, with Coahuila, had constituted a State of the Mexican Republic, declared her independence on the 2d of March, 1836; but the Mexican or Spanish law, except as to criminal cases, and except as modified by the congress, was continued as the law of the republic until the 16th of March, 1840, when the common law was adopted. By the common law an alien could indeed take land by purchase, but it would be liable to forfeiture to the king; and he could neither take nor transmit land by inheritance. Co. Litt. 2; 1 Bl. Com. 372; 2 id. 349; 3 Cruise, Dig. 365; Williams, Real Prop. 53;

2 Kent, Com. 53. It is conceded, however, by the counsel of the defendant, that important qualifications of this rule have always existed in the laws of Texas. The precise question is, whether a citizen of Mexico, not being a resident of Texas, but of some other Mexican State, owning lands in Texas at the time of the revolution, lost his title thereto, or his right to convey the same, or to transmit the same to his heirs, by means of the revolution, or by reason of subsequent legislation. The separation of Texas from the Republic of Mexico was the division of an empire. Up to the time of such division, all the citizens of the republic were citizens in every portion thereof, and had full right to hold property, movable or immovable, in every portion. If the revolution in Texas deprived the citizens of Mexico residing in other Mexican States of the right to hold and transmit their property situated in Texas, it amounted to confiscation. Did such confiscation take place by virtue of general international law, or by virtue of legislation adopted by Texas after its independence was declared? That such is not the general consequence of a division of empire, seems to be settled. Mr. Justice Nelson, delivering the opinion of this court in the case of *Jones* v. *McMasters* (20 How. 8), which related to a Texas title, says: " The general principle is undisputed, that the division of an empire works no forfeiture of a right of property previously acquired."

The original constitution of Texas, adopted March 17, 1836, fifteen days after the declaration of independence, did, indeed, provide as follows: " All persons who shall leave the country for the purpose of evading a participation in the present struggle, &c., shall forfeit all rights of citizenship, and such lands as they may hold in the republic." Gen. Provs., sect. 8. But this did not refer to Mexicans residing elsewhere. The tenth section, however, declared as follows : " No alien shall hold land in Texas except by titles emanating directly from the government of the republic; but if any citizen of this republic should die intestate or otherwise, his children or heirs shall inherit his estate ; and aliens shall have a reasonable time to take possession of and dispose of the same in a manner hereafter to be pointed out by law." So that, although it was declared that aliens should not hold lands in Texas, a reasonable

time was to be given to them to come in, or dispose of their lands, — the last clause evidently referring to aliens generally, and not merely to the " children and heirs " just referred to.

By an act of the congress of Texas, passed Jan. 28, 1840, it was provided as follows : " In making title to land by descent, it shall be no bar to a party that any ancestor through whom he derives his descent from the intestate is or hath been an alien ; and every alien to whom any land may be devised or may descend shall have nine years to become a citizen of the republic, and take possession of such land; or shall have nine years to sell the same before it shall be declared to be forfeited, or before it shall escheat to the government." Oldham & White, 699, 700.

This statute has continued in force to the present time, being re-enacted in 1848. The State Constitution of 1845 effected no change in rights of property, but expressly established existing rights. Art. 6, sect. 20. By an act passed Feb. 13, 1854 (Pasch. Dig., arts. 45–47), it was further provided, in favor of aliens, that they should have the same rights as are accorded to American citizens by the laws of the nation to which such aliens belong; including the right to take and hold property, real or personal, by devise or descent from any alien or citizen. This law being passed subsequent to the death of Anna Matilda Massieu, cannot affect the present case, but is cited for the purpose of illustrating the spirit and course of Texas legislation on the subject under consideration.

Aguilera became an alien to Texas by virtue of the separation of that State from the rest of the Mexican Republic. His title to the lands in question had been lawfully acquired before this forced alienage commenced, and whilst his rights of citizenship extended to Texas as a portion of the Republic of Mexico.

At that time, as before stated, the Spanish law, as modified by the local laws of Mexico and of the State of Coahuila and Texas, was the general law of the infant State ; and in some of the early cases in Texas, as in the *Heirs of Holliman* v. *Peebles* (1 Tex. 673), and in *Yates* v. *Iams* (10 id. 168), it was argued, though not expressly decided, that by the general Spanish law, and if not by that law, at least by the colonization laws of Mexico, and of Coahuila and Texas, a non-resident alien could not hold real estate. The same views were expressed in the case

of *McKinney* v. *Saviego*, 18 How. 235. But the laws referred to had respect to the case of aliens who, when they were such, acquired, or attempted to acquire, lands in Spain or her colonies, and not to the case of citizens or subjects who, on the division of an empire, happened to hold lands in the section in which they did not reside, and therefore had good title thereto when, by operation of law, they became aliens as to such section. It must be admitted that aliens of this class stand on a different footing, in equity at least, from those who, being aliens, attempt, against the law, to acquire real estate in a foreign country. It may be a wise policy to prevent the latter class from acquiring lands, whilst it would be extremely unjust to confiscate the lands of the former class, — lands which they had rightfully and innocently acquired, having only become aliens afterwards by force of law resulting from events beyond their control. This precise question came before this court in the case of *Jones et al.* v. *McMasters* (*supra*), and it was decided that the title of such persons is not divested by their forced alienage resulting from the division of an empire. In that case the plaintiff was a citizen of Mexico, and owned the land in controversy situated in Texas, at the period of the Texan revolution. The defendants claimed under patents from the State, and contended that the plaintiff must fail in her action. But it was sustained by the court below and by this court. Mr. Justice Nelson, in delivering the opinion of this court, said : " Assuming that the plaintiff is an alien, and not a citizen of Texas, the next question is, whether or not she is under any disability that would prevent her from the assertion of her title to the premises in question ; in other words, whether her absence and alienage worked a forfeiture of the estate. The general principle is undisputed, that the division of an empire works no forfeiture of a right of property previously acquired. *Kelly* v. *Harrison* (2 J. Cases, 29 ; 7 Pet. 87). And consequently the plaintiff's right still exists in full effect, unless the new sovereignty created, within which the lands are situate, has taken some steps to abrogate it. The title remains after the revolution, and erection of the new government, the same as before." This case was decided in December Term, 1857, and it is believed that no case in Texas has held the

contrary since that time. The same views were expressed, and many authorities cited in support thereof, in *Kilpatrick* v. *Sisneros* (23 Tex. 130–134), decided in 1859; also in *Sabriego* v. *White* (30 id. 581–584), decided in 1868, — all which cases are recognized in the late case of *Andrews* v. *Spear*, 48 id. 567.

We think, therefore, it may be regarded as settled that the severance of Texas from the Republic of Mexico did not divest the title of Aguilera to the lands in dispute.

This conclusion disposes of another point in the case, — the question as to the validity of the act of sale passed on the twelfth day of March, 1836, from Aguilera to Anna Matilda Massieu. Notwithstanding the existence of hostilities between Texas and Mexico, it was competent for one citizen of Mexico to convey to another, both residing and being in Mexico, lands situated in Texas. This point was settled by the late decision of this court in the case of *Conrad* v. *Waples*, 96 U. S. 279. We may assume, therefore, that at the time when the Constitution of Texas was adopted, on the 17th of March, 1836, the lands in dispute rightfully belonged to Anna Matilda Massieu, who was then an infant, and a citizen of Mexico residing in the city of Mexico.

Then did the Constitution which was adopted on the 17th of March, 1836, divest the title which Anna Matilda Massieu had acquired? We have already quoted its language, and have seen that whilst it declared that aliens should not hold lands in the republic, a reasonable time should be given to them by law to become citizens or to dispose of their lands.

It seems clear, therefore, that the Constitution itself did not, *proprio vigore*, divest the titles of aliens, especially the titles of those Mexican citizens who had become aliens by the course of events. It was left to future legislation to provide the mode and manner in which such divestiture should take place. This view is sustained by the cases already referred to, and by many others that might be cited on the subject. We may assume, therefore, that Anna Matilda Massieu continued to hold the title to the lands in question after, as well as before, the adoption of the Constitution on the 17th of March, 1836.

Then came the act of Jan. 28, 1840, already quoted, remov-

ing the bar of alienage in descents, and giving to aliens, and alien heirs, nine years to become citizens of the republic, and take possession of their land; or nine years to sell the same "before it shall be declared to be forfeited, or before it shall escheat to the government."

This law being passed whilst Anna Matilda Massieu was lawful owner of the land, gave her nine years to become a citizen, or dispose of the same before it could be forfeited by proceedings at the suit of the government. Of course, after the nine years should expire, namely, after Jan. 28, 1849, the land would be forfeitable if the legislature should, in the mean time, provide a proceeding to be taken for declaring such forfeiture. The common law, so far as not inconsistent with the Constitution or the acts of Congress, was adopted as a rule of decision in Texas on the 20th of January, 1840, to take effect on the 16th of March thereafter. But it is not perceived how this could materially affect the case under consideration, which was already provided for. The common-law doctrine respecting alienage as affecting title to land was superseded by the Constitution of the republic and the statute referred to.

The next modification of the law was made by the State Constitution of 1845, which by art. 13, sect. 4, provided as follows: "All fines, penalties, forfeitures, and escheats, which have accrued to the Republic of Texas, under the Constitution and laws, shall accrue to the State of Texas; and the legislature shall, by law, provide a method for determining what lands may have been forfeited or escheated."

This provision only renders it still more clear that the legislature must first act before any proceedings can be taken to annul the title of an alien, or any other escheatable titles. Under this provision, it has been held that, since its adoption, no locations can be made upon lands held by aliens on the ground of their title being void, since no law has been framed to provide the means for declaring forfeitures for alienage. *Hancock* v. *McKinney*, 7 Tex. 384; *Swift* v. *Herrera*, 9 id. 263; *Johnson* v. *Smith*, 21 id. 722; *Luter* v. *Mayfield*, 26 id. 325.

The only law which has been passed relating to proceedings for enforcing forfeitures and escheats is that of March 20, and which went into effect April 29, 1848. But this only relates

to the case of escheat when a person dies without heirs, and cannot apply to the plaintiffs if they were capable of inheriting from Anna Matilda Massieu in August, 1851, at the time of her death.

As to this point, we have seen that the act of January, 1840, declared that, in making title by descent, it should be no bar to a party that any ancestors through whom he derives his descent from the intestate is or hath been an alien. This law would seem to be the legitimate result of the status of aliens with regard to title to lands in Texas; the prohibition to hold lands being provisional only, not operative, unless they failed to become citizens, or to dispose of their lands, within nine years; and not even then, until regular proceedings should be provided for, and should be had, to annul the title. The later cases in Texas have fully established this doctrine. We refer particularly to the cases of *Sabriego* v. *White*, 30 id. 576; *Settegast* v. *Schrimpf*, 35 id. 323; and *Andrews* v. *Spear*, 48 id. 567.

From this review of the law of Texas, it would seem indubitable that the title of the plaintiffs to the land in question is free from objection on the score of alienage.

Then, have the plaintiffs a right to vindicate their title in the courts of justice? Several cases have undoubtedly decided that an alien cannot sue for lands in Texas. The last case referred to is that of *White* v. *Sabriego* (23 Tex. 243), which presented the naked question of alienage as a bar. The court, however, stated that under special circumstances aliens may sue; that is, under circumstances which entitle them to hold land; as, where they have a title emanating directly from the government, or where they acquired land by descent or purchase before the division of the empire and the change of government. In the subsequent case of *Sabriego* v.. *White* (30 id. 576), involving the same title, the plaintiff showed that the land was granted to her mother before the revolution; and that her mother (with herself) removed to Matamoras during the revolution, and her mother died there in 1842; and that the plaintiff had ever since continued to reside in Matamoras, remaining a Mexican citizen. The court held that the plaintiff lawfully succeeded to her mother's rights, and retained her title to the property, no office having been found to forfeit it;

and hence that she was entitled to maintain her action. The case of *Jones* v. *McMasters* (*supra*) is also a case in point on this question, it being there held that alienage was no bar to an action, if the title of the alien was good ; and the title was held good as against third persons until office found, and a judgment of forfeiture.

Our conclusion, therefore, is that the objection to the right of the plaintiffs to vindicate their title in the courts, as well as the objection to the title itself, was properly overruled.

The next question is whether the plaintiffs succeeded in proving the title by which they claimed the lands in dispute.

To prove the original grant from the government of Coahuila and Texas to Aguilera, the plaintiffs, at the trial, offered in evidence a certified copy from the general land-office of the Spanish title, consisting of Aguilera's petition for eleven leagues of land on Trinity River or elsewhere, the act of concession, dated March 20, 1830, the petition for possession in September, 1833, the reference for a survey, the notes of survey, and the title of possession, dated Nov. 26, 1833, executed by Vicente Aldrete, commandant at Nacogdoches and general commissioner of the government, in the presence of two witnesses.

The imperfect condition of the record does not enable us to understand clearly whether or not, in addition to this certified copy, a *testimonio* of the title was also offered in evidence. From a translated copy, and the fact that the Spanish original thereof was waived by the parties and not inserted in the record, we infer that such a *testimonio* was offered. From the translation referred to it appears that this *testimonio* was verified by the signature of Aldrete, and two assisting witnesses, named Rodriguez and Perez.

This paper purported, by certificates thereon, to have been recorded in August and October, 1870, in the counties of Anderson and Freestone, where the land lies. The only authentication of the instrument at the time of recording consisted of an affidavit made by one R. D. Johnson, at Galveston, in 1857, that the residence of the subscribing witnesses was unknown to him ; and a joint affidavit of one Taylor and one Edwards, made at Nacogdoches in 1857, deposing to the genuineness of Aldrete's signature.

The defendant objected to the admission of this evidence of the title as an authenticated and recorded instrument. The objection was overruled.

The admission of this evidence forms the basis of one of the errors assigned. If the accessary circumstance of the title having been recorded in the proper counties in 1870 had been a material fact in the determination of the cause, its admission as a recorded title would have made it necessary for us to examine the sufficiency of the affidavits in virtue of which the recording was made. But from the view which was taken of the case by the court below the recording of the instrument became immaterial; the learned judge holding that the defendant could claim no benefit from the fact that the plaintiffs' title was not properly recorded, inasmuch as both parties claimed the principal tract in question under titles emanating from the Mexican government, and therefore as between them the recording acts did not apply. If this position was correct, the recording of the plaintiffs' title was certainly immaterial; if not correct, the judgment should be reversed. It is unnecessary, therefore, to consider the question whether that title was properly authenticated for recording or not, a question which might give us some embarrassment. The correctness of the ruling made by the court will be considered further on.

Whether the *testimonio* was sufficiently authenticated to make it competent evidence of the title, as contradistinguished from its registry, it is also unnecessary to decide. It is clear that the certified copy of the title from the land-office was *prima facie* evidence of its existence; for it would be presumed that the original was an archive of the land-office. For the mere purpose, therefore, of proving title only, without clothing it with the privileges of registry, the certified copy was sufficient.

But after the plaintiffs had rested, the defendant recurred to his attack upon their evidence of the grant to Aguilera. He called as a witness the translator of the land-office, who produced the protocol or original title of said grant, and showed that it had never been deposited in the land-office until July, 1873, after the commencement of this action. The defendant further proved by E. A. Mexia that he, as agent of the plaintiffs, had procured the said protocol in June or July, 1873,

from the governor of the State of Coahuila in the Republic of Mexico, and had deposited the same in the general land-office of Texas in July, 1873. The defendant now moved to exclude the certified copy as evidence on the ground that the protocol was not an archive of the general land-office of Texas, but was an archive of the Mexican State of Coahuila, and was put in said office by a private individual without the authority or sanction of any law, and that there is no law of the State of Texas or of the United States authorizing the use of a copy thereof as evidence in any court or judicial proceeding. This motion was over-ruled, and the defendant excepted; and the question is again presented here as to the admissibility of the evidence.

We think the certified copy was admissible in evidence.

By an act of the congress of Texas, passed Dec. 14, 1837, it was declared " that it shall be the duty of every person or persons who may have in his or her possession or control any titles or documents whatever which relate to lands, and which, by the laws now or heretofore existing in Texas, have been and are considered archives, to deliver the same to the Commissioner of the General Land-Office, on his order, within sixty days after the final passage of this act." Pasch. Dig., art. 70. The sixth section of the same act constituted the land-office the proper depository of all books, records, papers, and original documents appertaining to the titles of lands denominated archives. Id., art. 71. There can be no doubt that the protocol of the title in question belonged to the class of documents here designated; and it does not appear that any law has ever been passed to prevent such documents from being deposited in the land-office at any time. It is true that a door is thereby left open for the perpetration of frauds; but fraud is always open to investigation, and if titles which have been long kept back from the proper public depository, and whose existence has thereby been unknown, are not allowed to disturb subsequent titles acquired *bona fide* in the mean time, the apprehended evil will be greatly diminished. This consideration renders it important that the position taken by the court below in reference to the question of registry as between persons holding under titles issued by the Mexican government should be carefully considered.

The next question to be considered, therefore, is whether a *bona fide* purchaser claiming under a Mexican title is bound to take notice of a prior Mexican title which is neither recorded in the proper county nor deposited in the land-office.

The defendant, in this case, claimed title to the 1,855-acre tract in question, under a grant of one league of land, dated June 26, 1835, from the government of Coahuila and Texas to one Edward C. Harris, and by the following intermediate conveyances from Harris to himself : 1st, a deed from Harris to one Hotchkiss, dated June 9, 1840; 2d, a deed from Hotchkiss to one Vail, dated April 24, 1844; 3d, a deed from Vail to one Mynott and his wife, dated June 1, 1855; 4th, a deed from Mynott and wife to one Kimbrough, dated Oct. 30, 1856, in pursuance of a title-bond executed in June, 1856; 5th, a deed from Kimbrough to the defendant and another person, dated Nov. 30, 1868, — all of which deeds were duly recorded. This chain of title was duly proved, and there was no evidence that the defendant or any of those through whom he deraigned title had, at the times they respectively acquired their titles, any actual notice of the existence of the said grant to Aguilera. Some proof was offered to show constructive notice, but the ruling of the court renders it unnecessary to consider it.

According to the view taken by the court below, none of the persons who thus acquired title under Harris could claim any benefit from the fact that Aguilera's title was totally unknown and unheard of, and that no trace of it was to be found in any public office of archives or records in Texas. If this be the law of Texas, the owners of lands in that State hold them by a very uncertain tenure.

But we cannot believe that this is a correct view of the law. However, the case may have stood between the original grantees of Coahuila and Texas, namely, Aguilera and Harris (and of this we express no opinion), we think that the subsequent *bona fide* purchasers and possessors under Harris acquired an unquestionable right to contest the unknown and dormant title of Aguilera, though antedating that under which they claimed.

The Texas recording acts are not so clear and explicit as they might be, it is true ; but, in our judgment, their tenor and spirit are sufficient to prevent such great injustice and wrong

as must necessarily follow if they do not apply to such a case as this.

The act of Dec. 20, 1836, " organizing inferior courts," &c., provided, amongst other things, as follows : —

" SECT. 37. Any person who owns or claims land of any description, by deed, lien, or other color of title, shall, within twelve months from the 1st of April next, have the same proven in open court, and recorded in the office of the clerk of the county court in which said land is situated ; but if a tract of land lies on the county lines, the title may be recorded in the county in which part of said land lies."

" SECT. 40. No deed, conveyance, lien, or other instrument in writing, shall take effect, as regards the interests and rights of third parties, until the same shall have been duly proven and presented to the court, as required by this act, for the recording of land titles. And it shall be the duty of the clerk to note particularly the time when such deed, conveyance, lien, or other instrument is presented, and to record them in the order in which they are presented." Pasch. Dig., arts. 4980, 4983.

The limit of time prescribed in the thirty-seventh section was repealed in 1838.

As most original titles in Texas, originating before the revolution, like that of Aguilera in this case, were public archives, the parties holding only *testimonios* thereof, the following law was passed Jan. 19, 1839 : —

" Copies of all deeds, &c., when the originals remain in the public archives, and were executed in conformity with the laws existing at their dates, duly certified by the proper officers, shall be admitted to record in the county where such land lies." Id., art. 4984.

It seems to us that these provisions cover the case under consideration. And such is the judgment of the Supreme Court of Texas. In the case of *Guilbeau* v. *Mays* (15 Tex. 410), the plaintiff claimed under a grant of a league of land from the former government ; the defendants pleaded prescription for three years, and that there was no record of the plaintiff's grant in the general land-office nor in the county where the land was situated ; that they held by patents issued from the government of Texas and locations of valid certificates, without notice of the plaintiff's title. The proofs corresponded with this de-

fence, and the court held it to be a valid one. After reviewing the laws above referred to, and the manifest policy by which they were dictated, they proceed as follows: "In view of the legislation on this subject, it is believed not to be susceptible of a doubt that the grants upon which the plaintiff bases his right to the lands in question ought to have been recorded, and their failure so to be recorded, or delineated on the maps, or other notice, will postpone them to a junior title, derived from the government, and will place the defendants in the position before the court as innocent purchasers without notice, and in principle not distinguishable from the great class of cases of innocent purchasers without notice of any prior or superior titles." This case is corroborated by the subsequent cases of *Musquis* v. *Blake*, 24 Tex. 461; *Nicholson* v. *Horton*, 23 id. 47; *Wilson* v. *Williams*, 25 id. 54.

Had the grant to Aguilera been deposited in the land-office, the case would have presented a question of very different consideration. It is generally conceded that an archive in the general land-office is entitled to all the privileges of an instrument recorded in the proper county. In the case just cited the court say: "Now, in cases of title emanating from the government, where the patent or *testimonio* had not been recorded in the county where the land lies, the archives of the general land-office and the maps of survey, and the records and maps of the county surveyor, would be regarded as notice that the land was appropriated, and was not a part of the vacant domain of the republic." See also *Byrne* v. *Fagan*, 16 Tex. 391; *Chambers* v. *Fisk*, 22 id. 504; *Wilson* v. *Williams*, 25 id. 54. But here all the transfers of the Harris tract took place before the Aguilera title was either recorded or deposited in the land-office. Under these circumstances, the plaintiffs should have been required to show that the defendant and those under whom he claimed had either actual or at least constructive notice of their title at the time when they respectively purchased; but the court required neither, holding in effect that the elder title was entitled to preference without any notice of its existence.

Of course, buying with actual notice of a previous title, or under circumstances which make it a duty to take notice, is a

fraud, and deprives the purchaser of the immunity arising from the fact that such title is not recorded nor deposited in the land-office. *Crosby* v. *Huston*, 1 Tex. 203 ; *Grumbles* v. *Sneed*, 22 id. 565.

By a late law, passed Oct. 20, 1866, a title not deposited in the land-office, and not recorded, will no longer avail as against certain descriptions of title without actual notice. The act is as follows : —

" Titles to land which may have been deposited in the general land-office subsequently to the time when the land embraced by such titles had been located and surveyed, by virtue of valid land warrants or certificates, shall not be received as evidence of superior title to the land against any such location or survey, unless such elder title had been duly recorded in the office of the county clerk of the county where the land may have been situated, prior to the location and survey, or the party having such location and survey made had actual notice of the existence of such elder title before he made such location and survey." Pasch. Dig., art. 5825.

Whether this law can properly be extended to protect any other titles than those based on " land warrants or certificates " may be questionable. But it is not necessary for the defendant to invoke the aid of this law : he can stand on the fair construction of the laws of 1836 and 1839. The title which he is called upon to combat was not to be found either in the land-office or in the records of the counties. the only public depositories to which the people could resort to ascertain what lands have been granted, and what are vacant and free ; and he may well insist that if he and his several grantors had not actual, they should at least have had constructive, notice of an elder title in order to be affected by it, — something beyond the mere fact of its existence ; some legal *indicia* or evidence of that existence, deposited in some proper place, which he was legally bound to find, and which, in the exercise of ordinary diligence, he might have found and relied on.

Many other questions are made in the record ; but as this is a controlling one, we have thought it unnecessary to discuss them. We are satisfied that the judgment must be reversed, with directions to award a new trial ; and it is

*So ordered.*