### CHADWICK et al. v. CAMPBELL.
### No. 2107.

Circuit Court of Appeals, Tenth Circuit.
Nov. 4, 1940.

John D. Wilson and J. Turley, both of Albuquerque, N. M. (George R. Craig and Geo. E. Remley, both of Albuquerque, N. M., on the brief), 'for appellants.

E. C. Iden, of Albuquerque, N. M. (Reid & Iden, of Albuquerque, N. M., on the brief), for appellee.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

Thomas D. Campbell sued the trustees of Sebilleta de La Joya Grant, and Charles D. Chadwick. The complaint contained two causes of action. One was in conventional form to quiet title to more than 215,000 acres of land in Socorro County, New Mexico; and the other was to cancel and satisfy of record an oil and gas lease covering such land, to recover damages for the clouding of plaintiff's title by the execution and recordation of such lease, and to enjoin defendants from further clouding or interfering with the title of plaintiff. Plaintiff prevailed, and defendants appealed. For convenience, reference will be made to the parties as they appeared in the trial court.

The land was originally a part of the Sebilleta de La Joya Grant, a Spanish land

grant, hereinafter referred to as the grant. Plaintiff deraigns title under a tax deed issued by the treasurer of Socorro County for unpaid taxes assessed for the years 1923, 1924, 1925, and 1926. By judgment of the district court of that county, the amount of such taxes was established and the lien foreclosed; and by order subsequently entered, the treasurer was directed to advertise and sell the land. The treasurer accepted plaintiff's bid, executed a deed, and reported the sale. The court confirmed the sale, approved the deed, and directed its delivery. Thereafter, the board of trustees of the grant executed and delivered to defendant Chadwick an oil and gas lease covering such land, and it was placed of record.

Section 223, chapter 133, Laws of New Mexico 1921, declares and makes subject to tax any interest or equity in land existing or accruing by, through or under a confirmed land grant originating from the Mexican or Spanish government; section 455 provides among other things that a tax deed shall be prima facie in any court in any suit or controversy respecting the rights of the purchaser, his heirs or assigns, that the land was subject to tax for the year or years stated in the deed, and that the taxes were not paid at any time prior to the sale; section 18, chapter 27, Laws of 1934, Sp.Sess. (§ 141-749 N.M. Supp.1938), is identical concerning the prima facie character of a tax deed; and section 24 (§ 141-755, supra), provides that in any suit or controversy involving title to property claimed and held under and by virtue of a tax deed executed by the treasurer, the party claiming adverse title to that conveyed by such deed shall, in order to defeat such title, be required to prove that the property was not subject to tax for the year or years named in the deed, or that the taxes were paid prior to the sale, or that the property was redeemed from the sale according to the provisions of the act, and that such redemption was made or had for the benefit of the persons having the right of redemption, and further, that fraud by the officer selling the land, or by the purchaser, shall be a defense. The provision in the statute that a tax deed shall be prima facie evidence that the land was subject to tax for the year or years named in such deed and that the taxes were not paid creates a rebuttable presumption. Cavender v. Phillips, 41 N.M. 235, 67 P.2d 250.

Defendants contend very earnestly that the grant was made to the Town of Sebilleta as a public corporation for certain specified purposes; that it was community or town grant; and that so long as it remained in community ownership it was not subject to tax by the state. Reliance is placed upon certain records in the office of the Surveyor General, at Santa Fe, New Mexico, to sustain the contention respecting the kind and character of the grant. The archives of that office contain a written application, dated May 25, 1819, signed by an attorney, a resident of Nuestra Senora de los Dolores de Sebilleta, made in the name of all the residents of such place. It is addressed to the Alcalde of the jurisdiction and requests a grant of the land which it is recited had been designated to them by certain boundaries and landmarks. A favorable recommendation by the local Alcalde is appended to such application. Then follows an order or decree signed by the Governor of the province of New Mexico, directing the Alcalde at Belen to assign the usual land to the petitioners, to cause them to place landmarks and boundaries, to draw up the proper documents, and having completed the undertaking to transmit a report to the Government for its knowledge and preservation. And the decree is followed, in turn, by a writing signed by the chief Alcalde of the jurisdiction of Belen that on June 4, 1819, he went to the settlement of Sebilleta and ordered to be assembled sixty-seven named persons constituting all the residents and inhabitants of the town, that they accepted the grant, that he gave them possession of it, that he ordered them to place landmarks, and that they did so. The Surveyor General certified in writing under date of November 14, 1874, that the muniments of title of a tract of land embracing the town and vicinity of Cevilleta were found among the archives of the Mexican Government at Santa Fe when the United States took possession of the country in 1846 and were transferred to his office in 1855; that he entertained no doubt of the validity and sufficiency of the claim to the land, and he recommended that it be confirmed by the Congress. But no action having been taken, the claim was submitted to the Court of Private Land Claims, a tribunal created by the Act of March 3, 1891, 26 Stat. 854. The court in 1893 made findings of fact and entered its order, judgment and decree that title to the land be established and confirmed in the sixty-seven named

persons who had been placed in possession thereof by the Alcalde, and "to their heirs, assigns and legal representatives". And a patent was issued in 1907. It recites that, under the act creating the Court of Private Land Claims, the claim of the sixty-seven named persons had been duly established "to private land grant known as the Sevilleta Grant", and the conveyance runs to such persons by name, "and to their heirs and assigns forever".

Neither the records in the office of the Surveyor General, nor the decree of the Court of Private Land Claims, nor the patent, refers to the grant as a community or town grant made to the Town of Sebilleta as a public corporation. None of these indicates that it was a grant of that kind, as distinguished from a private grant. On the contrary, the language in the decree establishing and confirming title in the individuals named, and their heirs, assigns and legal representatives, and the language in the patent conveying title to such individuals, and their heirs and assigns, reject the view that it was such a grant. More than that, the patent expressly refers to it as a private grant. There is no room for doubt that the decree established and confirmed title in the individuals as a private grant, and that the patent conveyed the land to them as a grant of that kind, not a town or community grant for specified community purposes.

By the Treaty of Guadalupe Hidalgo of February 2, 1848, 9 Stat. 922, 929, the United States acquired the right of property in all of the public lands of that portion of New Mexico which was ceded to this country. And while private rights of property within the ceded territory were unaffected by the change in sovereignty, the duty of providing the mode of securing such rights and of fulfilling the obligations imposed upon the United States in protecting them under its treaty obligations belonged to Congress; and Congress was free to discharge the duty itself or to delegate it. By the act creating the Court of Private Land Claims, the duty was delegated in respect to the determination of questions relating to grants within the ceded territory made by the government of Spain, and the issuance of patents in connection therewith. The decree establishing and confirming the title in the named persons, their heirs, and assigns, and the patent conveying it to them, as a private grant, are conclusive here in respect to the nature of their title, as between a public or a private grant. Tameling v. United States Freehold, etc., Co., 93 U.S. 644, 23 L.Ed. 998; United States v. Maxwell Land-Grant Co., 121 U.S. 325, 7 S.Ct. 1015, 30 L.Ed. 949; Astiazaran v. Santa Rita Land & Mining Co., 148 U.S. 80, 13 S.Ct. 457, 37 L.Ed. 376.

It is settled law in New Mexico that land constituting a private grant is subject to tax. State v. Board of Trustees of Town of Las Vegas, 28 N.M. 237, 210 P. 101; Board of Trustees of Town of Tome v. Sedillo, 28 N.M. 53, 210 P. 102; H. N. D. Land Co. v. Suazo, 44 N.M. 547, 105 P.2d 744.

But let it be assumed for the moment that under Spanish law the grant was a community grant for certain specified purposes, and that it remained unchanged under the laws of Mexico. Neither this extensive tract of land nor any revenue from it, except the taxes already adverted to and perhaps one other sum paid in an earlier year in compromise and adjustment of asserted taxes, has been devoted to the use or support of the State of New Mexico, or any of its subdivisions, or any public agency, or any other public purpose. Instead, through the years it has been appropriated exclusively to the private use and benefit of the grantees, their heirs, assigns and successors in interest. Proceeding upon the postulate that the grant was a town or community grant, not subject to tax under Spanish or Mexican sovereignty, the contention that it was exempt or immune from tax in New Mexico as long as it remained in community ownership is based primarily upon these provisions in the Treaty of Guadalupe Hidalgo, supra:

"Article VIII. Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present treaty, shall be free to continue where they now reside, or to remove at any time to the Mexican republic, retaining the property which they possess in the said territories, or disposing thereof, and removing the proceeds wherever they please, without their being subjected, on this account, to any contribution, tax, or charge whatever.

"Those who shall prefer to remain in the said territories, may either retain the title and rights of Mexican citizens, or acquire those of citizens of the United States. But they shall be under the obligation to make their election within one year from

the date of the exchange of ratifications of this treaty; and those who shall remain in the said territories after the expiration of that year, without having declared their intention to retain the character of Mexicans, shall be considered to have elected to become citizens of the United States.

"In the said territories, property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guaranties equally ample as if the same belonged to citizens of the United States.

"Article IX. Mexicans who, in the territories aforesaid, shall not preserve the character of citizens of the Mexican republic, conformably with what is stipulated in the preceding article, shall be incorporated into the Union of the United States, and be admitted at the proper time (to be judged of by the Congress of the United States) to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution; and in the mean time shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction."

 The first paragraph of Article VIII provides that Mexicans established in the territory becoming a part of the United States should be free either to remain where they then resided or to remove at any time back to Mexico; that they should have the right to retain the property which they possessed in such territories, or to dispose of it, and to remove the proceeds of sale according to their pleasure without being subjected, on that account, to any contribution, tax, or charge. The inhibition against contribution, tax, or charge plainly refers to the right or privilege of removing from the United States the proceeds of sale of property. It has no reference whatever to a tax regularly assessed against land and property remaining in the United States. The second paragraph gave to those who remained in territory the choice of retaining the title and rights of citizens of Mexico or of acquiring the rights of citizens of the United States; but they were required to make such election within one year from the effective ratification of the treaty, and those who failed to exercise the right of election within that time should be considered to have elected to become citizens of the United States. It has nothing whatever to do with tax upon land or other property. And the last paragraph provides that the property in such territory, then belonging to Mexicans not established there, should be inviolably respected, and that such Mexican owners, and their heirs, and all Mexicans thereafter acquiring such property, should enjoy with respect thereto the same guaranties as though it belonged to citizens of the United States. That does not provide either by express language or fair intendment that property then belonging to or subsequently acquired by Mexican citizens should thereafter be exempt or immune from ordinary taxes for governmental purposes. It merely guarantees to such Mexican owners equality in respect of such property with citizens of the United States owning similar property. Rather than creating an exemption from taxation, it suggests equality, and forbids discrimination.

 Article IX merely provides that Mexicans in the territory who failed to preserve their citizenship in the Mexican republic in the manner delineated in the preceding article, should be incorporated into the United States, and be admitted to the enjoyment of all the constitutional rights of citizens of the United States; and in the meantime, be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction. The plain purpose of the article was to protect such Mexicans against discrimination in respect to their property or religion. Any distinction between property then owned by them and that owned by citizens of the United States in respect to taxation is clearly foreign to the intent of the signatory nations. Equality, not difference or distinction was the objective. We find nothing in either provision of the treaty which guarantees exemption or immunity from ad valorem taxes regularly assessed and levied.

 The provision in the judgment awarding plaintiff damages in the sum of $500 is challenged for want of sufficient evidence to support it. The court found that the oil and gas lease was given and acquired wilfully, maliciously, not in good faith, and without any right or authority to incumber plaintiff's title; and that plaintiff had been damaged in that sum by rea-

son of the clouding of his title, and by reason of delay, cost and expenses of the suit. It suffices to say that we see no occasion to disturb the findings.

The views which we have already expressed render it unnecessary to consider the question whether certain judicial proceedings had in the state court of Socorro County determining that the land within the grant was subject to tax constitute res judicata.

The judgment is affirmed.