AMAYA et al. v. STANOLIND OIL & GAS CO. et al.

No. 11751.

Circuit Court of Appeals, Fifth Circuit.

Dec. 27, 1946.

Rehearing Denied Jan. 21, 1947.

Tex., and Dennis B. Chapin, of Mission, Tex., for appellants.

Frank J. Scurlock, of Dallas, Tex., Benjamin Dudley Tarlton and Walter M. Lewright, both of Corpus Christi, Tex., and Paul A. McDermott, of Fort Worth, Tex., for appellees.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

WALLER, Circuit Judge.

The Plaintiffs, citizens of Mexico, claiming an interest in oil lands under a grant from the kingdom of Spain, and a right to recover for their portion of the minerals taken from the lands, have appealed from an adverse decree.[1]

The lands lie between the Nueces and Rio Grande rivers in Texas. The original grantee from the kingdom of Spain conveyed the lands in 1811 to Pedro Ygnacio Garcia, a remote ancestor of the Plaintiffs, and likewise a citizen and resident of Mexico.

The Plaintiffs contend that the land between the Nueces and Rio Grande rivers was never under the jurisdiction of the United States nor of the State of Texas until same were ceded by the treaty of Guadalupe Hidalgo on February 2, 1848; that the lands involved in this suit are within the area so ceded and are within the protection of Article VIII in the treaty requiring title of Mexican citizens to such lands to be "inviolably respected;" and that by that article of the treaty the lands involved in this suit were secured against the passage by Congress or by the Legislature of Texas of any statutes of limitation, forfeiture, or prescription whereby Mexican citizens, not established in Texas, might lose title and possession of such lands. Plaintiffs concede that they cannot recover if the statutes of limitation of Texas can be lawfully applied.

That part of Article VIII of the treaty which provoked this controversy announced that: "In the said territories, property of every kind, now belonging to Mexicans William Lawrence Scarborough and E. not established there shall be inviolably Garland Brown, both of Corpus Christi, respected. The present owners, the heirs

---

[1] Amaya v. Stanolind Oil & Gas Co., D.C., 62 F.Supp. 181.

of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it, guarantees equally ample as if same belonged to citizens of the United States." (9 U.S.Statutes at Large, 922 et seq.)

Considering the narrowness of the controlling question, as we view it, a remarkable amount of historical knowledge and legal learning has been expended in the discussions. The views of counsel and of the lower court have been elaborately presented. Nevertheless, the case seems to require from us no extended discussion in order to vindicate the soundness of the conclusions which we have reached.

Our answer is found in the words of the treaty rather than in the pages of history. It would not be fatal to the correctness of our conclusion were it to be conceded that the lands between the Nueces and the Rio Grande did not come under the suzerainty of the Republic of Texas, or the United States of America, until they were ceded in and by the treaty of Guadalupe Hidalgo, and that the State of Texas never acquired jurisdiction over these until the passage by Congress of the Compromise Agreement of 1850. 48 U.S.C.A. § 1451 et seq.

Antecedent to a construction of the pertinent passage of the treaty it would seem profitable to consider the relation of treaties generally to federal and state constitutions and statutes.

Clause 2 of Article VI of the Constitution of the United States provides that: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

A treaty lawfully entered into stands on the same footing of supremacy as does the Constitution and Laws of the United States. It is generally self-operating in that it requires no legislation by either Congress or the state. Asakura v.

Seattle, 265 U.S. 332, 44 S.Ct. 515, 68 L.Ed. 1041. A treaty must be regarded as a part of the law of the state as much as are the state's own statutes and it may override the power of the state even in respect of the great body of private relations which usually fall within the control of the state. The treaty-making power might even be superior to those powers which are reserved to the states. State of Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641, 11 A.L.R. 984.

But while there is no express limitation in the federal Constitution upon the treaty-making power, nevertheless it is not unlimited. It is subject to prohibitions within that Constitution against the state, or federal government. The treaty-making power does not extend "So far as to authorize what the constitution forbids". Geofroy v. Riggs, 133 U.S. 258, 10 S.Ct. 295, 297, 33 L.Ed. 642; Asakura v. Seattle, supra; Missouri v. Holland, supra; The Cherokee Tobacco, 11 Wall. 616, 78 U.S. 616, 20 L.Ed. 227.

In United States v. Fox, 94 U.S. 315, 24 L.Ed. 192, it was stated: "The power of the State to regulate the tenure of real property within her limits, and the modes of its acquisition and transfer, and the rules of its descent, and the extent to which a testamentary disposition of it may be exercised by its owners, is undoubted. It is an established principle of law, everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent, or any other mode, is exclusively subject to the government within whose jurisdiction the property is situated. McCormick v. Sullivant, 10 Wheat. 192, 202, 6 L.Ed. 300. The power of the State in this respect follows from her sovereignty within her limits, as to all matters over which jurisdiction has not been expressly or by necessary implication transferred to the Federal government. The title and modes of disposition of real property within the State, whether inter vivos or testamentary, are not matters placed under the control of Federal authority. Such control would be foreign to the purposes

for which the Federal government was created, and would seriously embarrass the landed interests of the State."

See also Pennoyer v. Neff, 95 U.S. 714, 715, 24 L.Ed. 565.

Is the contention of the Plaintiffs that the treaty forever takes from the State of Texas the power to enact statutes of limitation or other statutes that might adversely affect the title or possession of Mexicans and Texas citizens alike, inconsistent with the general rule of international law that in case of the division of an empire the power to regulate and control property passes to the new sovereign of the area involved? Would the interpretation of the treaty sought by the Plaintiffs be out of harmony with the dual sovereignty plan of government under which the states have the exclusive right to pass laws regulating the alienation, tenure, title, and possession of lands within their boundaries? Would the requirement that the property of a non-resident alien be free from statutes of limitation or state regulation while that of a citizen of the state where the lands are located should be subject to such statutes, be inconsonant with the general concept of the equal protection of the law and likewise repugnant to the general purpose of the last sentence of Article VIII of the treaty?

We propound these thought-provoking questions not for the purpose of answering them but only for the purpose of showing the chasms of doubt into which the path laid out by Appellants might lead us.

We should seek to avoid, if possible, a decision adjudging a treaty to be in conflict with the Constitution. It is not necessary to a decision in this case for us to pass upon the question of whether the treaty is violative of the prohibitions of the federal Constitution, as we would be compelled to do if the treaty required the construction contended for by Appellants.

 Concededly, for a century Mexico has had no suzerainty over the areas in which these lands are situated. Whether the lands involved were ceded or conquered, they have been a part of the United States for at least 100 years and a part of the State of Texas at least since the enactment of the Compromise Agreement of 1850. Whether by cession or conquest, they were split away from the Mexican nation so that there was a substitution of sovereignty under which all laws theretofore in force which were in conflict with the political character and constitutional institutions of the substituted sovereign lost their force. Vilas v. Manilla, 220 U.S. 345, 31 S.Ct. 416, 55 L.Ed. 491; Chicago, Rock Island & Pacific Railway v. McGlinn, 114 U.S. 542, 5 S.Ct. 1005, 29 L.Ed. 270.

The Supreme Court, in Airhart v. Massieu, 98 U.S. 491, 25 L.Ed. 213, said: "The separation of Texas from the Republic of Mexico °was the division of an Empire."

In Leitensdorfer et al. v. Webb, 20 How. 176, 61 U.S. 176, 15 L.Ed. 891, the Court, in discussing property rights after the acquisition by military force, said: "By this substitution of a new supremacy, although the former political relations of the inhabitants were dissolved, their private relations, their rights vested under the government of their former allegiance, or those arising from contract or usage, remain in full force and unchanged, except so far as they were in their nature and character found to be in conflict with the Constitution and laws of the United States, *or with any regulations which the conquering and occupying authority should ordain.*" (Emphasis added.)

This principle should apply in this case unless the treaty clearly provides the contrary.

 We are convinced, however, as was the lower Court, that there is nothing in the treaty that suggests that the property of Mexican citizens would not be subject to the valid, and non-discriminatory, property laws of the State of Texas. The phrase "inviolably respected," even if singled out for construction, does not carry with it the significance urged by the Plaintiffs. The phrase must be read in connection with the rest of the paragraph wherein the phrase is further explained by the statement that all Mexicans, whether presently owning, or subsequently acquiring, property, shall enjoy, with respect to

it, guarantees equally as ample as those of citizens of the United States.

Even though we detach the phrase "properties of every kind, now belonging to Mexicans, .not established there, shall be inviolably respected" and construe it separately, or unrelatedly to the last sentence, Plaintiffs would gain nothing thereby. Although much stress is laid by Plaintiffs upon the word "inviolably," is there a real, or substantial, distinction between a statement that property belonging to Mexicans shall be "respected" and a statement that property belonging to Mexicans shall be *"inviolably* respected?" It would seem that titles that are "respected" would be as secure as *those that were *"inviolably* respected.'

We regard the phrase as a covenant on the part of the United States to respect from thenceforth any title that Mexicans then had, or might thereafter acquire, to property within the region, but not that it would guarantee that those Mexicans would never lose their title to persons by foreclosure, sales under execution, trespasses, adverse possession, and other non-governmental acts. It has been held in Chadwick v. Campbell, 10 Cir., 115 F.2d 401, that the treaty of Guadalupe Hidalgo did not protect against ad valorem taxes on the land of a Mexican within the ceded area.

The principles of international law impose substantially the same obligation to respect property rights within annexed territory as did Art. VIII of the treaty of Guadalupe Hidalgo. United States v. O'Donnell, 303 U.S. 501,[2] 58 S.Ct. 708, 82 L.Ed. 980.

Since the obligation of the treaty was substantially the same as is required by international law, and since international law does not prohibit the successor sovereign from subsequently enacting legislation in due course as to title to lands, there seems to be no reason to hold that the treaty prohibited this merely by the use of the word "inviolably."

The fundamental purpose of that provision of the treaty was to secure Mexicans in their title and to guarantee to them in that respect the same protection of law that it extended to the citizens of the United States. Baldwin v. Goldfrank, 88 Tex. 249, 31 S.W. 1064, text, 1067; Chadwick v. Campbell, supra; Ely's Adm'r v. United States, 171 U.S. 220, 18 S.Ct. 840, 43 L.Ed. 142; Leitensdorfer v. Webb, supra; Todok v. Union State Bank, 281 U.S. 449, 50 S.Ct. 363, 74 L.Ed. 956.

It should not be overlooked that the main purpose of statutes of limitation relating to land is to put titles at rest, and that such statutes are great healers of weak titles, the benefits of which, under the treaty and under the statutes of Texas, were available to Mexicans and Texans alike.

■ Since we are of the opinion that Article VIII of the treaty does not prevent the passage by the State of Texas of reasonable and non-discriminatory statutes regulating the title and possession of land, and since it is conceded that if this be true, adverse possession by Defendants and their predecessors in title has long since ripened into a title by limitation, there is no necessity for us to consider the question as to whether or not the lands between the Nueces and Rio Grande rivers were ceded by the treaty or were already under the jurisdiction, and within the domain, of the Republic of Texas, nor whether Texas acquired no jurisdiction over the land until after the passage of the Compromise Agreement between the United States and Texas, September 9, 1850. Certain it is that the lands in question are now within the boundaries of the State of Texas, and it is immaterial whether the lands were acquired by the surrender of Santa Anna or ceded by the treaty of Guadalupe Hidalgo, or whether, as was decided in McKin-

---

2 The footnote at page 510 of 303 U.S., at page 714 of 58 S.Ct. states: "The obligation imposed by the principles of international law to respect property rights within annexed territory is substantially that recognized by the treaty, (citing cases) and comprehends not only formal grants 'but also any concession, warrant, order or permission to survey, possess or settle, whether evidenced by writing or parol, or presumed from possession.' "

ney v. Saviego, 18 How. 235, 15 L.Ed. 365; Basse v. City of Brownsville, 154 U.S. 610, 14 S.Ct. 1195, 22 L.Ed. 420; and State v. Bustamente, 47 Tex. 320, they had been acquired by the Republic of Texas prior to the making of the treaty of Guadalupe Hidalgo.

The provisions of the treaty do not save the Appellants from the fatal effect of the passage of time under the statutes of limitation of the State of Texas.

The judgment is affirmed.