## TAYLOR and others *v.* LIFE ASS'N OF AMERICA and others.

*(Circuit Court, W. D. Tennessee.* October 2, 1882.)

**1. CORPORATIONS—INSOLVENCY—PRIORITIES—ATTACHMENT—LIEN.**

Creditors attaching the assets of an insolvent corporation, for the purpose of winding it up under the statutes of Tennessee, acquire, by the attachment, no lien or right of priority in the assets which are to be distributed *pro rata* among all the creditors residing in the state or elsewhere.

**2. SAME—CONFLICT OF LAWS—INTERSTATE OR INTERNATIONAL EFFECT OF INSOLVENCY.**

While the state court may seize the assets of an insolvent foreign corporation, and administer them as a trust fund for the benefit of creditors, in the absence of a statute especially declaring a preference or lien in favor of home creditors, the distribution is *pro rata* wherever the creditors reside, and the fund belongs to all the creditors, and not exclusively to those residing in the state of Tennessee.

**3. SAME—ATTACHMENT—ASSIGNMENT—RECEIVER—SITUS OF PROMISSORY NOTES.**

Where a mutual life insurance company, in which all the policy-holders are members, becomes insolvent and passes into the hands of a receiver under the decrees of a court at the domicile of the corporation, and by order of the court the company by deed assigns all its assets, wherever situated, to the receiver, the assignment will pass promissory notes of debtors residing in another state held by and in the possession of the company and the receiver, and prevails over an attachment subsequently levied by creditors in the state of the debtors. For this purpose the *situs* of the debt is the domicile of the creditor.

**4. SAME—FOREIGN CORPORATION—INSURANCE—SEPARATE DEPARTMENTS—LIENS.**

Where a corporation, by its constitution and by-laws, provided for local control by boards of department directors, and required to be loaned in each department a sum equal to two-thirds of the net present terminal value or premium reserve of all premiums, paying whole life and endowment insurance policies of persons resident within such department, there is nothing in the scheme which gives policy-holders any lien or right of priority in the assets within the particular department. Such a lien or priority can only be created by apt words in the statutes, by-laws, or the contract itself, and will not be implied from that mode of doing business.

**5. SAME—SUIT TO WIND UP CORPORATION IN THE STATE OF DOMICILE—SUBSEQUENT SUITS IN OTHER STATE.**

Where a life insurance company became insolvent, and under the laws of the state of its creation was, by suit instituted for the purpose, placed in the hands of a receiver to wind it up and distribute its assets, a bill filed by creditors in Tennessee, in a state court, to attach its assets in that state, and wind it up and distribute its assets there situated according to the insolvency laws of that state, will be, on removal to the federal court, if the Tennessee creditors are not entitled to any specific lien or right of priority, dismissed, and the creditors must seek satisfaction in the insolvency proceedings of the home state of the insolvent corporation.

**6. REMOVAL OF CAUSES—EQUITY CASES—STATE AND FEDERAL RULES OF DECISION.**

In controversies between citizens of different states the parties may invoke, by removal, the general principles of equity prevailing uniformly in the fed-

eral courts, and in such cases the federal court cannot be governed by state statutes or rules of decision unless they constitute rules of property to be enforced. The statutes of Tennessee, authorizing the state equity courts to wind up insolvent corporations and distribute the assets in Tennessee, do not confer on Tennessee creditors any special right to the assests, or constitute rules of property which the federal courts must enforce. They merely enlarge or declare the jurisdiction of the state courts, and do not affect the jurisdiction of the federal court.

7. COSTS IN EQUITY.

Where the plaintiffs had a fair cause to suppose that separate insolvency administrations would be necessary in each state, on a dismissal of the bill here the defendant was not allowed costs, but each party was required to pay his own costs.

In Equity.

This is a bill by policy-holders residing in Tennessee, claiming a return of premiums for policies not matured by death or otherwise, filed in the state court under the provisions of the Code of that state, to attach the assets, consisting of debts due to an insolvent life insurance company of Missouri, and to wind it up and distribute the assets in Tennessee according to the laws of that state. Attachment and injunction issued, and the cause was removed to the federal court where a receiver was appointed. The corporation and its receiver, who was made a party, answered, setting up that the corporation was already being administered in insolvency by the state court of Missouri, the state of its creation, and that a receiver had been there appointed who was proceeding to wind it up according to law and the rights of the parties; that under a decree of the court the corporation had made to him a deed of assignment, conveying all its assets, wherever situated, and that he was in the possession of the notes of debtors residing in Tennessee attached by this bill. By an amended bill the plaintiffs claimed that this company did business in departments and separately in each state under separate boards of directors, and that, according to the constitution and by-laws and under the contract expressed thereby, the policy-holders in each department had a lien or priority on the assets in that department for the satisfaction of their policies. Besides the provision for the organization of departments in a state or less subdivision of a state under local boards of directors in each department, the sections of the constitution and by-laws most pertinent to this claim of lien or priority read as follows:

"Sec. 51, (charter 1869.) The net present value of the liabilities of the company under policies issued to members of each department, as fixed by the standard of valuation of the company, shall be invested and kept invested

within such department: provided, however, that no such investment shall be made except in the manner and upon the securities provided in section 52."

"Sec. 26, (charter 1872.) There shall be loaned and kept loaned in each department a sum equal to the net present value or premium reserve, as fixed by the association's standard of valuation of all policies in force upon the lives of persons resident within such department," with a similar proviso as contained in section 51.

"Sec. 23, (charter 1873.) There shall be loaned and kept loaned in each department a sum equal to the net present terminal or premium reserve (taken at the end of the preceding policy year, and computed by a net valuation of $4\frac{1}{2}$ per cent. yearly interest, and the table of mortality designated by the general board of directors) of all participating full life and endowment insurance policies in force upon the lives of persons resident within such department;" followed by a similar proviso as in the sections above quoted.

Section 13 (charter 1877) is precisely like section 23 immediately preceding, except that the amount to be loaned and kept loaned in each department is reduced to "*two-thirds* of the net present terminal or premium reserve," etc.

There are other sections relied upon by the defendant as showing the unity of the company, and that those above quoted do not give a lien to resident policy-holders, but they need not be quoted here. The case was heard on final hearing upon bill, answers, and proof of representations of agents, circulars, etc.

*Smith & Collier*, for plaintiffs.

*Wright & Folkes*, for defendants.

HAMMOND, D. J. I had reached a conclusion in this case to sustain the bill and leave the question open, upon reference to a master, whether one creditor could claim any priority of satisfaction over another in the distribution of the assets, (although as the proof stands I could not see how such a claim could be sustained,) because the question could be finally determined only when the distribution is made. *Smith* v. *St. Louis Ins. Co.* 6 Lea, 564, 570. But for reasons that will presently appear I have found it necessary to determine now whether or not the plaintiffs, who are the Tennessee creditors, have any lien on the assets in this state. It may be conceded here, for the purposes of the argument, that a state may, by its insolvency laws, appropriate all the assets in that state to the payment of creditors residing there, in preference to and exclusion of all others. It is sufficient answer to say that the state of Tennessee has never done that, and its insolvency laws make no discrimination of the kind among creditors. Our attachment laws against non-resident and fraudulent debtors permit a race of diligence among creditors who

may by this process acquire liens, but the writ must be levied before any special or general assignment or transfer of the property, which is not fraudulent against the creditor. In this case the property consists of indebtedness of persons residing here, evidenced by note and secured by liens on real estate. Now, whether a statutory assignment, under the insolvent laws of Missouri, operates to transfer property of that kind in this state or not; whether these plaintiffs, who are policy-holders in a Missouri corporation of the mutual kind, where all are said to be *quasi* partners in the enterprise, are bound by the Missouri laws passed for its regulation while it is solvent, or when it becomes insolvent, or not, certainly all persons are bound by any valid, specific transfer of the property. If a citizen of Missouri holds the note of a citizen of Tennessee, and transfers it, by indorsement or otherwise, there can be no doubt the transfer would prevail over an attachment subsequently levied in Tennessee, unless it were fraudulent. Here there has been such an assignment, both by decree of a competent court, having the creditor before it, and by the creditor's own deed for the purpose; and this in the domicile of the creditor. This certainly operated to pass the title to the notes before this attachment by garnishment was levied, and to avoid its effect, and permit the Tennessee creditors to appropriate the property by attachment, the assignment must be set aside as fraudulent or inoperative for some reason. That assigned is that it was without consideration, and only an insolvent assignment, made under a decree of a court, by compulsion of law, which does not operate outside of Missouri.

In *Kirtland* v. *Hotchkiss*, 98 U. S. 491, it is said the *situs* of a debt is for the purposes of taxation, if not for all purposes, the domicile of the creditor. Where the transaction is *inter vivos*, the better rule seems to be that the *situs* of a debt is the domicile of the creditor, and this is with us the rule, even in the administration of decedent's estates, where the principle is of more doubtful application. If so, this property was situated in Missouri, and not in Tennessee, and passed by the assignment or decree, or both. Whart. Confl. Laws, (2d Ed.) §§ 359–371; *Wilkins* v. *Ellett*, 9 Wall. 740; *Goodlett* v. *Anderson*, 7 Lea, 286; *St. John* v. *Hodges*, 9 Bax. 334. Besides, the laws of Tennessee recognize the validity of an assignment in another state to pass the title to debts owed by citizens of this state, where there is notice of it before the attachment. *Flickey* v. *Loney*, 4 Bax. 170. Here the bill shows these creditors had notice of the proceedings in Missouri. Moreover, this is a mutual company, and under the laws of Missouri these Tennessee policy-holders, by its

own constitution and by-laws, *became members of the company,* and if, in any court, they are creditors, (as no doubt they are in one sense,) they cannot ignore the fact that they are creditors of a peculiar kind, and subject to all the equities or obligations that exist as between themselves and all the other policy-holders of the company. They are creditors in a very remote grade, perhaps, as it is possible their claims for premiums paid would be postponed till all other creditors have been satisfied. *Dean's Appeal,* 14 Cent. Law J. 196. What is it that gives the members of this mutual company of policyholders whose policies had not matured by death or otherwise when the company failed, the right to disturb the principle of equality in the distribution of its assets by a race of diligence with attachments? They are only creditors as members of the company; they are mutually debtors as well as mutually creditors in their relative obligations to each other to share equally or according to their scheme in this enterprise. I do not mean to say that as individuals they are debtors instead of the corporation, for this is not so; but in their relation as members of a mutual company, and only in that relation, are they creditors. They derive all their rights through the laws of Missouri; and their contracts with each other, namely, their policies, are governed by these laws and the contract itself. They cannot, when the storm of insolvency comes, separate themselves from this peculiar relation, and claim as *creditors* in the ordinary acceptation of the term; treat their co-members as other creditors, and the corporation as an independent entity, and run a race for an inequitable preference in the assets on any notion that, as citizens of this state and creditors, they may have all the assets here. Their being citizens of Tennessee does not release them from their mutual obligation as incorporators and as policy-holders in this company. For purposes of federal jurisdiction they would be treated conclusively as citizens of Missouri; and while I do not intimate that for the purposes of this case they are to be so treated, I cite that anomalous fiction as showing how intimately a citizen of one state, who is a member of a corporation in another, is bound to that corporation. Our own state court has established that we will give effect to the laws of another state regulating its corporations whenever the rights of the litigants before the court depend upon them, as they clearly do in this case. *Talmadge* v. *American Co.* 3 Head, 337. None of the exceptions mentioned by Dr. Wharton in his text above cited apply here. We have a statute authorizing foreign receivers to sue in

our courts, and without it they may where no policy of our own is contravened. Act 1879, c. 135, p. 173; *Cagill* v. *Wooldridge*, 8 Bax. 580; *Booth* v. *Clark* 17 How. 322.

I do not think, therefore, that the attachment in this case gives the parties any priority of lien. Very much has been said in the argument about the rights these parties had in the state court under state statutes and state laws, and the wrong done to deprive them of these rights by removal to this court. It is familiar law here that the federal courts of equity administer only the general equity law, and that state statutes and state decisions cannot change the principles or rules of decision by which they are governed. *Payne* v. *Hook*, 7 Wall. 425, and numerous other cases cited everywhere; Bump, Fed. Proc. 126. Citizens of other states have a right to invoke the benefit of general principles of equity prevailing in the federal courts of equity by a removal of their controversies to this court, and I know of no principle which requires the federal courts to decide the cause in cases removed according to the statutory or judicial rules of equitable decision prescribed by the states any more than in original cases. If the state statutes referred to were required to give state equity courts jurisdiction to wind up foreign corporations in insolvency, it does not follow that these statutes can confer that jurisdiction on this court. If a statute gives a lien or creates a trust it becomes a rule of property, which we enforce and possibly state statutes may enlarge—they certainly cannot *restrict*—equitable remedies in such a way that federal courts of equity will administer them. I do not think this case presents that question. I have not the least doubt that the chancellor and the supreme court of Tennessee would decide the questions I am now considering just as I do here. There is nothing in the statutes that gives the creditor, who files the bill to wind up a corporation, priority over other creditors; and when the court comes to administer the assets they are distributed *pro rata*, or according to the liens or preferences existing by contract, or such other liens as exist upon them, and thus to all creditors alike, resident and non-resident. *Marr* v. *Bank of West Tennessee*, 4 Cold. 471. The object of the attachment is to secure the assets by impounding them, but it cannot be claimed that in proceedings to wind up an insolvent corporation or an insolvent estate priority is to be given to the creditor filing the bill, or to one residing at home, in preference to one residing in another state. No case so decides. The courts do not tolerate attempts to acquire such preferences. *Yonley* v. *Lavender*, 21 Wall. 276. Sometimes, in a

race of diligence among creditors, liens may be acquired by judgments or attachments before the insolvent bill is filed, which are enforced when the claim is presented; but in these statutory proceedings to wind up corporations the statute itself says that the fund shall be distributed *pro rata*. Tenn. Code, §§ 4294, 4295, 3431.

The cases of *Smith* v. *St. Louis, etc.*, 6 Lea, 564; S. C. 3 Tenn. Ch. 502; and *Liepold* v. *Marony*, 7 Lea, 128, only establish that the state courts may, under these statutes, wind up an insolvent foreign corporation; they do not decide that the home creditors would have any priority; that question is reserved. And if foreign creditors share *pro rata* in winding up a domestic corporation, there would seem to be no substantial reason for giving home creditors a preference on the winding up of a foreign corporation. It is a preference that is not given in settling insolvent estates of decedents, nor in any other insolvency proceeding; such, for example, as an insolvency assignment made within this state. Why, then, should the distinction be made here? The claim for it is founded on a misapprehension of the effect of these statutes and the doctrine of insolvency in its interstate or international relations. Because our courts will seize the property of an insolvent debtor, whether an individual or a corporation, situated within this state, and, treating it as a trust fund,—which means nothing more than that creditors and not the stockholders are entitled to subject it in a court of equity to the payment of their claims—satisfy creditors here rather than permit the property to be carried out of the jurisdiction to be distributed according to laws existing elsewhere, *non constat* that they will prefer home creditors to the exclusion of others in its distribution. A right to wind up an insolvent corporation, and distribute its assets equally among all creditors, on the theory that after insolvency the assets constitute a trust fund for distribution among creditors, instead of belonging to the stockholders or the first taker, does not become a rule of property in the sense that the creditors in this state have a lien on it or a preference to it any more than a right to sue to judgment and take out execution, becomes a rule of property. Possibly a state might, by law, adopt such a policy and give such a lien, but this state has never done it, and it would be antagonistic not only to the equitable doctrine of equality, but to all our other insolvency laws. And I do not doubt that state courts of equity, administering these assets under these statutes and decisions, would give full force and effect to the laws of Missouri, governing the members of this company *inter sese* as we would here. *Talmadge* v. *North Am. Co., supra*. Tennessee

at one time had a distinct policy of requiring foreign insurance corporations to deposit bonds, or otherwise secure our home people, as a condition precedent for a license to do business here; but that has been repealed. In such case, of course, there would be an equitable or legal right to funds so deposited, but it would grow out of the positive statute, and not the international or interstate law of insolvency.

The only other claim for priority is that based upon the departmental mode of doing business by this company. It is claimed as a *contract*, or as an implication of one, arising from the constitution and by-laws of the company, and its mode of doing business. I do not think this claim deserves serious attention. If a policy should mature while this company was in business, the holder would certainly look to the general funds for payment. It would be an anomalous scheme of insurance if he could not. It would, instead of distributing the loss throughout a large area and among great numbers, restrict it to a single state or less subdivision, and thus impair the system of extended averages on which successful insurance depends. Losses occurring in department A, if not finding there sufficient assets to pay them, would find in all the other departments priorities compelling the holders to go to some department where there was a surplus over the priorities there existing; and in this struggle for payment the whole scheme would be wrecked. Nothing less than apt and certain words in the contract, or statutes and by-laws, should bind policy-holders to so disastrous and anomalous a scheme of insurance. There are no such words in the policies, the charter, the constitution, or the by-laws of this corporation. It was evidently only a scheme to extend and invite business by requiring a certain proportion of the funds of the company to be loaned or invested within the limits of the department under local boards of directors or trustees, instead of confining the investments, as most great companies do, at or near the centers of capital and trade. In one sense this scheme affords *security* to the local policy-holders in having assets at home, the value of which they could secure by their own supervision of investments, and, if occasion required, subject by judgment and execution in local courts; but, doubtless, the main attraction of the scheme, and that upon which reliance was placed to extend business, was the feature which afforded an opportunity to borrow the money of the company and keep it in circulation here, instead of sending it away for investment. The witnesses in this case speak of an understanding derived from the representations by the agents, and in the advertisements and circulars, that they would have the assets in this state as a security

for their policies. There is nothing in these representations to justify such an understanding in any other sense of security than that just mentioned; but if there were, it could not prevail over the contract contained in the policies as interpreted by the laws, constitution, and regulations governing the business of the company; and, as before remarked, there is in none of these, in my judgment, a line, word, or syllable indicating that the policy-holders in this department were to have any lien, preference, or priority of payment out of the assets of the company invested here.

Irrespective of any right to a lien or preference of payment out of these assets, it was my own judgment that, in the absence of a uniform system of bankruptcy established by congress, we are relegated to the wretched and disastrous system of separate and independent insolvency laws in each state; that each state could claim to administer according to its own laws all the assets of an insolvent found within its jurisdiction; that while, for the purposes of taxation, transfer of title, etc., the *situs* of a debt is the domicile of the creditor, for the purposes of seizure and administration in insolvency the forum of the debtor would be taken as its *situs*, because there it must ordinarily be collected, particularly where, as in this case, it was secured by liens on real estate; and therefore it was my opinion that, ruinous as it is to have repeated administrations of the assets of this corporation in each state of the union, we could not deny the right of the plaintiffs to administer those in this state by this bill; and this, whether the rights of the parties were to be governed by the laws of Missouri or not, whether they had liens and preferences or not, and whether or not they were to be paid first, or the distribution was to be made to all creditors everywhere, of which I have no doubt. It was and is my judgment that to prevent this ruin the constitution confers on congress the power to establish a uniform system of bankruptcy, and that the only remedy is to be there found. Whart. Confl. Laws, (2d Ed.) §§ 386–390. Story, Confl. Laws, §§ 403 *et seq.*, 550 *et seq.* But it was said at the bar that, in a case in the district of Kentucky against this corporation, the learned circuit judge dismissed a bill like this. He informs me that this is true, and that he proceeded on the ground that, where the plaintiffs had no specific lien acquired by attachment or otherwise before the proceedings in Missouri were commenced, and no right of preference, the bill should be, upon principles of comity, dismissed, and the parties left to file their claims in the proceedings in Missouri. I cheerfully yield my judgment to his, as it is my duty to

do; and finding that, under our Tennessee laws, these plaintiffs, as I have endeavored to show, have no lien by their attachment or otherwise, and no right of preference, the bill must be dismissed. *Goodyear* v. *Willis*, 1 Flippin, 388. This disposition of the case likewise finds support in the adjudications made in other circuits; and, having no toleration for the disastrous determination of creditors to seek administration of these assets in many states, instead of in the one under whose laws they have all been acting, and by which they are bound in their enterprise, unless for more ·substantial reasons arising out of unjust discriminations in that state than any appearing in this case, I more readily yield to their authority. *Davis* v. *Life Ass'n of America*, 11 FED. REP. 781; *Rundle* v. *Life Ass'n of America*, 10 FED. REP. 720; *Relfe* v. *Rundle*, 103 U. S. 222; *Hamilton* v. *Choteau*, 2 McCrary, 509; *Hutchinson* v. *Green*, Id. 471.

The question of costs has troubled me somewhat. I am in the habit of decreeing costs against the losing party, and think that should be the general rule in equity, as at law. ' But in · this case there are considerations' upon which courts of equity may proceed in decreeing costs that are entitled to weight. Beames, Eq. Costs, 159, (20 Law Lib. 54.) These plaintiffs had, notwithstanding the impolicy of insisting on a separate administration of the assets in each state, a fair case for supposing that in the absence of a bankrupt law such administrations were probable, if not a necessity, in each state. I shall therefore decree no costs to either party against the other, but, where not already paid, in favor of the officers entitled to costs against each for his own costs, to be taxed by the master under further directions, if necessary. Bill dismissed.

NOTE. See *Taylor* v. *Life Ass'n of America*, 3 FED. REP. 465.